## SMITH v. LEE.

### (Circuit Court of Appeals, First Circuit.    January 18, 1895.)

#### No. 103.

1. BILL OF LADING—INTERPRETATION AS TO PLACE OF DELIVERY.
   A bill of lading whereby the ship contracts to deliver a cargo of coal at a designated port to the consignee, "or his assigns,' is not to be construed as an express undertaking to deliver at the particular coal wharf owned by the consignee, and where he carries on his coal business.

2. SAME—DUTIES OF MASTER AND CONSIGNEE—TOWAGE.
   A cargo of coal was shipped from Philadelphia to a consignee owning a coal wharf above bridge 8, Cambridgeport, Mass.   By the bill of lading he was to pay freight at the rate of 75 cents per ton, "and 3 cents per ton per bridge for 7 bridges, and towing up and down from 7 bridges."   Held, that this did not require the consignee to take charge of the vessel and tow her up from bridge 7, but merely bound him to pay expenses of such towage, leaving the same to be done under control and direction of the master, both as to time and manner of towing; and that any delay resulting from the tug's fault, and not from the dangerous or inaccessible situation of the wharf, was imputable to the master, and not to the consignee.

3. SAME—DEMURRAGE—NOTICE OF ARRIVAL.
   The provision in a bill of lading that 24 hours after arrival in port, and notice thereof to the consignee, there shall be allowed a fixed rate of unloading per day, and that the consignee shall pay demurrage for any excess of time required, casts upon the consignee any loss of time resulting from delay in pointing out the place of discharge, but imposes on the master the duty of bringing his vessel to the berth indicated, and for any delay in so doing, not arising from the unsuitableness of the berth or its approaches, or fault of the consignee, the master is responsible, and must bear the loss.

Appeal from the District Court of the United States for the District of Massachusetts.

This was a libel in personam by Lewis S. Lee, master of the schooner Ada Bailey, against George M. Smith to recover demurrage.    The district court rendered a decree for libelant, and respondent appealed.

Charles T. Russell, Jr., William E. Russell, and Arthur H. Russell, for appellant.

Eugene P. Carver and Edward E. Blodgett, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge.    This is a libel for demurrage for ——— days of the schooner Ada Bailey, under the following bill of lading:

Shipped by the Philadelphia & Reading Coal and Iron Company, in good order, on board the schooner called "Ada Bailey," of ———, for account of Percy Heilner & Son, whereof the undersigned is master for the present voyage, and now lying at the port of Philadelphia, and bound for Cambridgeport, Mass., eight hundred & twenty-eight tons, of 2240 lbs., Schuylkill coal (as per margin), which I promise to deliver at the aforesaid port of Cambridgeport in like good order (the dangers of the sea only excepted), unto G. M. Smith, or his assigns, he or they paying freight for the same at the rate of seventy-five cents per ton, & discharge, & 3c per ton per bridge for 7 bridges, & towing up & down from 7 bridge.    And 24 hours after the arrival at the above-named

port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day (Sundays and legal holidays excepted) for every one hundred and fifty tons thereof; after which, the cargo. consignee, and assignee shall pay demurrage at the rate of six cents per ton a day (Sundays and legal holidays not excepted), upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and pro rata for parts and portions of a day beyond the days above specified, until the cargo is fully discharged; which freight and demurrage shall constitute a lien upon said cargo. * * * In witness whereof, etc.

Dated at Philadelphia, this 19th day of July, 1892.

Smith, the consignee named in this document, was a large dealer in coal, and carried on his business at his wharf, above bridge 8, in Cambridgeport. Between the river channel and that wharf a channel nearly a half mile long had been dredged, and access to the wharf for vessels could be only through that channel. When the Ada Bailey had passed through seven bridges, and anchored in the port of Cambridgeport, her master gave notice of his arrival, and was without delay directed by the consignee, Smith, to proceed to his wharf above referred to for discharge of cargo. The master of the schooner not knowing where to secure the services of a tugboat to tow the schooner and cargo through bridge 8, and to the wharf pointed out for the discharge of the cargo, the consignee offered, "if it would be any accommodation, to step into the office of the Commercial Towboat Company and ask them to send a tug up to get him in." He said it would. Thereupon the consignee went to the towboat company's office, and they sent a boat the same day. This was on the Monday following the report of arrival on Wednesday. In the meantime the evidence does not show that anything had been done to get to the wharf, and of this omission we have no explanation. When the towboat reached the schooner, and took hold of her, bridge 8 was passed without trouble; but in attempting to reach the place of discharge, through the dredged channel, the schooner got aground, and was not able to reach the wharf. The tug pulled the schooner off, and towed her back to the place between bridges 7 and 8, where she had first anchored, and there left her, and did not return.

The appellants contend that, in view of the fact that the consignee, Smith, owned and carried on his business on a coal wharf in the designated port of delivery, the contract must be construed to be the same as if it had contained an express undertaking to deliver at that wharf. We cannot so construe it. The delivery, by the bill of lading, was to be made to Smith or his assignees. It was therefore in the power of Smith, by indorsement of the bill of lading, to transfer the cargo to another, who would then have the right to select a proper place of discharge, within the designated port. Upon assignment of the bill of lading, the master would not have been sustained in refusing to comply with the order of the assignee, and insisting, against his will, to discharge at the wharf of Smith. Under this bill of lading an assignee would have the same right of directing where the cargo should be unladen as if mentioned in it by name. In signing it, the master would rightly understand that

the special place of discharge at his port of destination was undetermined, and would depend on the choice of whosoever might have control of the cargo on its arrival.

The libelant and appellee argues that, by the proper construction of the contract, the consignee or his assigns were bound, after the schooner had proceeded above bridge 7, and reported, to take charge of her, and to tow her to her discharging berth. This, in the opinion of the court, is a mistaken view of the contract. The consignee was to pay a fixed amount per ton for carriage from Philadelphia and through each of seven bridges, and all the expense of towing above the seven bridges, let it be more or less. The towing above the seven bridges, like that through them, was to be directed, controlled, and superintended by the master, who should employ his tug, direct the time of towing, and generally manage his vessel as might be prudent; but the expense of the towing was to be reimbursed to him by the consignee. The consignee had no duty in regard to this towing, except to pay its costs; and what he did in leaving a request that a towboat should be sent to do the work made no difference.

It then was the duty of the consignee to select and designate a safe and proper place for the discharge of this cargo; not only a place safe for the vessel to lie after it was reached, but one which could be safely approached. This we think he did. The dredged channel was nearly straight, and was at least 50 feet wide. It was well marked by buoys. The district judge in his opinion says that several of the buoys had been carried away. He evidently overlooked the proof that at the time of these transactions none of the buoys were missing, and that the removal testified to occurred much later. As to the depth of that channel, the proof is not as direct as might have been, but we think it sufficiently shows it enough for the safe passage of this schooner, drawing, when loaded, 14 feet and 3 inches. The channel was dredged under a contract for 16 feet at average tides. No examination or soundings appear ever to have been made for the purpose of ascertaining how faithfully this work was executed. But it is shown that the rise and fall of tides at this place varied from 8 to 11½ feet, and Smith testifies, without contradiction, that he has sounded out that channel and found from 8 to 9 feet of water at mean low water. We are clear that the grounding of the schooner was not due to unsuitableness of the channel, but to the fault of the towboat. There is no complaint of want of water at the wharf. Evidence of conversation at Philadelphia regarding the depth of water, not referred to in the bill of lading, was properly excluded; but if that evidence were admitted there is nothing in the case to show the statements were not true. If, however, that evidence were admissible, it would show that the captain of the schooner was content with a guaranty of 15 feet of water, and regarded it as enough for his vessel, drawing 14 feet 3 inches. The 24-hours clause of the bill of lading, while it requires the consignee to be ready to receive the cargo at the expiration of that time, after notice, and casts upon him any

loss of time arising from delay in pointing out the place of discharge, after the notice, does not relieve the vessel from herself being ready to deliver at the selected berth, provided it is safe, and can be safely reached. Notice imposes on the master the duty to bring his vessel to the berth given her, and for any delay in so doing, not arising from the unsuitableness of the berth or its approaches, or fault of the consignee, he is responsible, and must bear the loss. As the place of discharge was a proper one, and was at once named by the consignee on receiving notice, his only obligation was to receive the cargo at the end of 24 hours at the rate stipulated in the bill of lading. Demurrage is claimed only for time taken by the schooner in getting to her berth. For that the master alone was responsible, and the decree of the district court must be reversed, with costs. The case is remanded to the district court, with direction to dismiss the libel, with costs of the district court and of this court.