## THOMPSON v. WINSLOW.

### (District Court, D. Maine. February 29, 1904.)

### No. 100.

1. SHIPPING—CONSTRUCTION OF CHARTER—DUTY AND RISK OF TOWAGE.

   A bill of lading for a cargo of coal provided that it should be carried from Philadelphia to Portland, Me., and there delivered, "consignees paying freight for the same at the rate of 90c. and discharged, and to tow vessel in and out of Back Bay free." *Held*, that the contract did not bind the consignee to pay for the towage but to provide the same, and that, after the vessel arrived in port and notified the consignee, the duty and risk of the towage service rested upon him.

2. SAME.

   The schooner arrived in the harbor of Portland on Saturday at about noon, and shortly thereafter the master, who was unacquainted with the port, went to the office of a towboat company and inquired the location of the consignee's wharf, and at his request the agent of the company notified the consignee of the schooner's arrival. The master did not make any effort to engage a tug. Later the same day the agent of the towboat company again telephoned the consignee, and was told that he wished the schooner in by Monday morning. Sunday the agent went out to the schooner with a tug, and made arrangements to take her in that afternoon. The master made no contract for the towage nor to assume the risk, and the consignee had received the bill of lading containing the contract several days before. *Held*, that the towboat company, in performing the service, was acting under employment of the consignee, and not of the vessel.

3. SAME—LIABILITY OF CHARTERER FOR NEGLIGENT TOWAGE—EMPLOYMENT OF TOWING COMPANY.

   The consignee of a cargo, having assumed by his contract the duty of furnishing towage, cannot relieve himself from liability for the manner in which it is performed by the employment of a towing company, and is responsible to the vessel for any damage or injury caused by the negligent manner in which the service is performed by such company.

4. TOWAGE — DUTY OF KNOWLEDGE AND SKILL — LIABILITY FOR NEGLIGENT SERVICE.

   The consignee of a cargo of coal to be delivered at Portland, Me., who had engaged to furnish towage in and out of the Back Bay, in which his wharf was situated, employed a local towboat company to perform the service. The schooner was heavily laden, and had a draft of 21 feet aft. The master had no knowledge of the harbor. The company undertook the towage with two tugs, but the depth of water in the channel was insufficient and the schooner stranded on a bar, and in attempting to pull her over the bar she was considerably injured. The captains of the tugs were competent and experienced men, but had no knowledge of the depth of water in the channel, and did not ascertain the same, although the schooner was a vessel of larger draft than the company had ever taken through it. *Held*, that the company was negligent in undertaking the service under such circumstances, and their negligence rendered the consignee liable for the injury to the vessel, her master not being chargeable with negligence in trusting to the supposed skill and knowledge of the masters of the tugs.

In Admiralty. Suit to recover balance of freight, and for damage to schooner by stranding while in tow.

Benjamin Thompson, for libelant.

W. K. & A. E. Neal and Seth L. Larrabee, for respondent.

HALE, District Judge. The libelant brings this libel in personam, in behalf of himself and the other owners of the schooner Marjory

Brown, against Edward B. Winslow, doing business as Winslow & Co., to recover for a balance of the freight on a cargo of coal which the schooner was carrying at the time of the injury, and also to recover for alleged damage to said schooner while in tow of the steam tugs of the Central Wharf Towboat Company, and being towed from Portland Lower Harbor, through the bridge of the Grand Trunk Railway Company, and through Tukey's Bridge, into Back Bay, in order to reach the wharf of the respondent, at which the cargo was to be discharged.

The Marjory Brown is a four-masted schooner of the burden of 1,061 tons, about 220 feet long over all, and with coal carrying capacity of about 1,900 tons. She was drawing, at the time of the injury, 19½ feet forward and 21 feet aft. The respondent is engaged in the business of the manufacture and sale of stoneware at the head of Back Bay, in Portland, and has annually many vessels consigned to him and delivering cargoes at his wharf. In order to reach this wharf, it is necessary for vessels to proceed through the draw of the Grand Trunk Railway Bridge and of Tukey's Bridge, and then up through Back Bay by a channel recently dredged by the United States. Tukey's Bridge is nearly parallel with, and about 1,500 feet westerly from, the Grand Trunk Railway Bridge. The draws of the two bridges are located to conform to the general course of the channel, which swings a little to the northwest after leaving the Grand Trunk Railway Bridge, and before reaching Tukey's Bridge. The United States government chart shows that there are two channels extending a considerable distance from Tukey's Bridge toward the Grand Trunk Railway Bridge. The testimony shows that one of these channels, called the "Southern Channel," has a depth of about 14½ or 15 feet at mean low water, and the other, the northern channel, has about 11 feet at mean low water. About August 13, 1903, the schooner Marjory Brown was chartered to load at Philadelphia a cargo of coal to be carried to Portland, Me. The evidence of the terms of the contract is contained in the bill of lading. Under that bill of lading the schooner received at Philadelphia a cargo of 1,874 tons of coal, and August 19, 1903, the master executed the bill of lading, with this provision: that the cargo was to be delivered "at the aforesaid port of Portland, Maine, dangers of the sea only excepted, unto Winslow & Company, or to his or their assigns; consignees paying freight for the same at the rate of 90c. and discharged, and to tow vessel in and out of Back Bay free." A copy of the bill of lading was sent to Winslow & Co., and was received by them prior to the arrival of the schooner with her cargo at the port of Portland. Before that time, the consignee had received instructions from the shipper as soon as the cargo had been loaded, and about the 20th of August he got the bill of lading. The schooner came into the harbor of Portland about noon, Saturday, the 29th of August, sailing in without the aid of a tug, and coming to anchor in the lower harbor. From this point it is necessary for all sailing vessels to take a tug in order to proceed into Back Bay to the discharging berth of the respondent. Shortly after arrival, about 1 o'clock in the afternoon, Capt. Thompson, the master of the vessel, the libelant in this suit, came on shore, went to the office of the Central Wharf Towboat Company, and made inquiries as to the location of the office of Winslow & Co., his consignee. He

learned that it was some distance away, and thereupon requested Mr. York, agent of the towboat company, to notify Winslow & Co. of the schooner's arrival. Mr. York thereupon called Winslow & Co. on the telephone, and informed them of the arrival of the schooner Marjory Brown; and the bookkeeper in the employ of Winslow & Co. indorsed upon the copy of the bill of lading, held by them, the words, "Reported Saturday, August 29, at 2 p. m." Captain Thompson did not engage any tug to tow his vessel into Back Bay, nor make any efforts in that direction. Later in the same afternoon, August 29th, Mr. York, the agent of the towboat company, again telephoned to Winslow & Co., and talked with the respondent's superintendent, Mr. Hersey, who informed him that they would want the Brown at their dock to begin work on Monday morning. On Sunday afternoon Mr. York and Capt. McDuffie, the master of one of the company's tugs, went off to the schooner in the steam tug Fannie G., and told the libelant that the consignees wanted the schooner at their berth to begin discharging on the following morning. They also told him that the towboat company did not want to assume any risk in towing the vessel through the Back Bay; that they thought the schooner would go over the shoal all right, but that if she stopped she would not be injured, as the bottom was level. They mentioned, further, that the schooner Alicia B. Crosby had stopped on the shoal, and had gotten off without damage. They also said that if the schooner did not go up that afternoon it would be some days before she could be towed up, as the tides were falling off. Capt. Thompson then asked Mr. York and Capt. McDuffie why they didn't tow the vessel up the day before—Saturday. He testifies that he told them further that he did not want to assume any responsibility about the towing of his vessel. The testimony does not show that the libelant agreed to relieve the towboat company from any responsibility in the management of the vessel, or that he agreed to assume the risk. His testimony further shows that he was a stranger in the port, and had no knowledge of the shoals over which the schooner was to be towed, nor of the depth of the water. Between 4 and 5 o'clock the same afternoon—Sunday—within an hour and a half of high water, the steam tugs Belknap and Fannie G., of the Central Wharf Towboat Company, proceeded to the libelant's vessel, and, as soon as her anchor was weighed, started to tow her toward the Grand Trunk Railway Bridge. After passing the draw of that bridge, the schooner swung somewhat to the southward; the Belknap then made fast on the port quarter of the schooner, and the Fannie G. was put in position under her bow; together these tugs pushed the vessel in a northwesterly direction, so as to get her on a course to enter the draw of Tukey's Bridge. The schooner then proceeded at the rate of some 2 or 3 knots an hour, headed in a line parallel with the draw pier of Tukey's Bridge, and about 300 feet from the bridge she took bottom. Capt. Thompson then suggested that she be towed astern, but Capt. McDuffie, who had charge of the towage, said that the only thing to do was to tow her ahead, and that she would soon be over the shoal spot. Accordingly, the tugs attempted to tow the schooner ahead, but, although they had the aid of the schooner's steam power, they were unable to move her. On the ebb of the tide that night, the schooner listed

to port and remained in that situation until the high water of Monday. On Monday afternoon, a little before high water, the steam tugs Belknap and Portland, of the Central Wharf Towboat Company, reached the schooner, and, not finding her afloat, they proceeded ahead on the hawser, in the effort to jump her over the place where she had grounded. In their efforts they broke a new eight-inch hawser several times, cut into the bits, and were compelled to put the hawser around the foremast, to the great peril of his foremast, as the captain thought. But they succeeded in moving the schooner only about 50 to 75 feet. At low water that night, and on the following day, the schooner's bow was in 20 feet of water, and her stern, drawing only 13½ feet of water, was sticking up in the air; she listed to port nearly 40 degrees, and began to show signs of strain, and to leak. Another unsuccessful attempt was made to haul the schooner off, Tuesday night. On Wednesday, September 2d, a lighter was engaged by the superintendent of the respondent, and about 100 tons of cargo were discharged in the after hatch. At high water that afternoon, the towboats, after great effort, hauled the schooner off. In doing this they were aided by the schooner's steam capstan, and by a hawser running to the pier of the bridge. The schooner was then towed toward the consignee's dock, but stuck in the mud about 200 feet from it, the tugs leaving her and coming back the next day. After some more cargo had been lightered, the schooner was hauled into her discharging berth. The cargo was discharged by the consignee. After this the libelant demanded payment of his freight, the consignee declining to pay unless the master would allow the expenses of lightering. This Capt. Thompson refused to do. The schooner was afterwards towed out of Back Bay by one of the Central Wharf Towboat Company's tugs, on Wednesday, September 9th. She then proceeded to Bath, and was hauled out on the Marine Railway. On examination of the schooner's bottom it was found that her butts were all opened aft, and that the keel was "all mashed up" to a distance of about 125 feet; at a point about 10 feet aft of the fore rigging, and aft of the spanker rigging, the keel was crushed toward the bilge 12 or 14 inches, and for a space fore and aft of about 10 or 12 feet; between these two points, for a distance of between 60 and 70 feet fore and aft, the keel was completely turned up, half on one side and half on the other.

The first inquiry for the court to make is, what was the contract under which the schooner was performing her voyage and seeking to deliver her cargo? The bill of lading shows that the cargo was to be delivered "unto Winslow & Company, or to his or their assigns; consignees paying freight for the same at the rate of 90c. and discharged, and to tow vessel in and out of Back Bay free." What is the meaning of the above language? In the recent case of The Somers N. Smith, in this court (D. C.) 120 Fed. 570, the charter provided that the vessel was to be "loaded and discharged and free wharfage, and towed out of Long Cove free." The court proceeded on the assumption in the case that it was the duty of the charterer, under the terms of the charter above quoted, to furnish the towboat and perform the towage service, and that the towboat assumed the risk of injury occasioned

by its service. The language of the bill of lading in the case at bar is substantially the same as in that case.

In Barrett v. The Oregon Railway Company (D. C.) 22 Fed. 452, the charter was to carry a cargo from New York to Portland, Or., for a lump sum, the charterer "to pay" for the necessary lighterage between Astoria and Portland, the port of discharge. Under this language the court held that it was the duty of the charterer not "to furnish" or to provide the lighterage, but only "to pay" for it. The court said:

> "If the defendant had agreed 'to pay' all pilotage incurred by the vessel on the voyage, it might as well be held 'to furnish' it also, as to furnish lighterage, under this charter party. Nor is it likely or reasonable that if the parties to this contract ever contemplated that the defendant was to provide or furnish the lighterage under any circumstances, as well as to pay for it, they would have omitted to say it. An agreement 'to furnish' lighterage may, under ordinary circumstances, be construed to include the necessary expense of so doing. But an agreement 'to pay' for lighterage, in terms, no more includes the physical act of furnishing or providing the same, than the less does the greater, or a part the whole. Keen v. Audenried, 5 Ben. 535 [Fed. Cas. No. 7,639], is a case on all fours with this. A schooner was chartered to carry coals from Baltimore to Pawtucket, Rhode Island, the charterer to pay freight at a certain rate per ton, 'with towage from Providence to Pawtucket.' There was a delay in procuring towage at Providence, and the master of the schooner sued the charterer for demurrage, alleging that he was bound to furnish the towage, and was therefore responsible for the delay. But Mr. Justice Blatchford, before whom the case was tried, construed the somewhat ambiguous phrase 'with towage,' as used in connection with the stipulation for the payment of freight, as binding the charterer 'to pay' the cost of the towage, but not 'to provide' it."

In Smith v. Lee, 66 Fed. 344, 13 C. C. A. 506, a cargo of coal was shipped from Philadelphia to a consignee having a coal wharf above bridge 8, in the port of Cambridgeport, Mass. By the bill of lading he was to pay freight at the rate of 75 cents per ton, and 3 cents per ton per bridge for 7 bridges and towing up and down from Bridge 7; and it was held in the Circuit Court of Appeals, Judge Webb drawing the opinion, that this did not require the consignee to take charge of a vessel and tow her up from Bridge 7, but merely bound him to pay expenses of such towage, leaving the same to be done under control and direction of the master, both as to time and manner of towing; and that any delay resulting from the tug's fault, and not from the dangerous or inaccessible situation of the wharf, was imputable to the master, and not to the consignee.

The cases cited clearly show a distinction to be made between the two kinds of contract. In the case last cited, the consignee was to "pay" the freight at a certain fixed rate per ton and discharge, and was to pay the bridge money for seven bridges and the towing above Bridge 7, whatever the cost of towage might be. In that case the master might have selected any towboat, paid the charges, and compelled the consignee to repay him the towage. In the case at bar, as in the case of The Somers N. Smith, the contract must be construed to mean that the consignee agrees in effect to "furnish" the tug and perform the service. The consignee might, under such contract, be assumed to furnish his own tug; in any event, he could not be compelled by a master to pay any towage service that was contracted for by the master without his knowledge or consent. In the case at bar the contract must be held to be that the consignees were to tow the vessel in and out of Back Bay

free. When the schooner, then, came to the port of Portland, and notified the consignee that she was there at anchorage, no technical report was required, but simply a notification that she was at the port, ready for the consignee to perform his contract with reference to towage. The schooner had fully performed that part of the voyage which it was her duty to perform, and after that the schooner was at the service of the respondent, the consignee, and it was his duty to tow her into the discharging berth. In other words, the case at bar does not furnish an instance of a contract merely to "pay for" the towage, but to "furnish" the towage. It follows, then, that all the details of the towage service were left to the consignee. Among these details were how and when the towage should be performed, and it follows that the risk attending such service must be wholly with the consignee, because the consignee had expressly contracted to perform the service; he could furnish the towage service, either himself personally by his own crew, and by his own tugs, or by the employment of any third party. The court must hold, then, that the risk of the towage service was upon the consignee.

The court must inquire next, how did the consignee meet this duty of performing the towage service, and under what, if any, liabilities is he placed? The testimony shows that Capt. Thompson, the master, arrived with his vessel and anchored in Portland Lower Harbor, but that he did not engage towage. We have already found that it was the duty of the consignee to furnish such towage, and the testimony shows clearly that the towage service was performed by the Central Wharf Towboat Company. Was such service performed by the towboat company in the employment of the consignee? Or, in other words, did the respondent employ the Central Wharf Towboat Company to perform the towage service? The consignee must have known that he had chartered a large vessel, carrying a large cargo of almost 2,000 tons. The consignee is fully charged with knowledge that the place through which the vessel must be towed to reach his wharf was a hazardous place for a vessel of the large tonnage of the Marjory Brown. It was the duty of the charterer to see that the vessel with her large cargo was towed through this hazardous place to his discharging berth. It is not in evidence that the consignee owns any tugs; clearly, then, he is compelled to hire somebody to do the towage service. The evidence shows that, to perform this kind of hazardous service, the Central Wharf Towboat Company was the only company which had boats reasonably available which were able to render this towage service. Capt. Thompson, the master of the schooner, testifies that, although the steam tug Belknap of the Central Wharf Towboat Company followed him in, he did not engage towage of the tug, and no conversation was had with the captain of the tug about towage; that he had no conversation at the towboat office about towing around; that he never had any talk, after reaching Portland, about towing his vessel into Back Bay; but that on Sunday, the day after their arrival, Mr. York, the agent of the towboat company, and Capt. McDuffie went to the schooner, had an interview with libelant, and told him that they had orders to take the vessel up. Mr. York says, also, that he received notice of the schooner's arrival, and that he is under the impression that he received it from the captain of one of the boats; that

he then notified Winslow & Co. of the schooner's arrival with coal for them; and that he asked when they wanted her at her berth, and they told him that they wanted her around so as to commence work on her Monday morning. The court must come to the conclusion, on this question of fact, that' the Central Wharf Towboat Company was employed by the respondent to do the towage service in this case, and that, acting under that employment, it proceeded to do that service.

The court must next inquire, were the consignees, at law, liable for the acts and defaults of the towboat company in the performance of its towage duty? In Gannon v. Consolidated Ice Company, 91 Fed. 539, 33 C. C. A. 662, the following facts appear: Gannon, the libelant, let to the respondent a canal boat, for a per diem compensation, to be used in the transportation of ice. The ice company then contracted with one Sheehey to tow the boat from Troy to Crescent, on the Erie Canal, at the rate of $7 per trip. Sheehey was regularly engaged in the towing business, and employed his own men, and used his own horses in conducting that business. While he was towing the boat, it was, by the negligence of his servants, run against a pier and injured. The respondent company disclaimed responsibility for the damage, setting up that Sheehey was an "independent contractor," and that his servants were not its servants, and that 'it, therefore, was not liable for their acts. In a libel in personam, the Court of Appeals in the Second Circuit held:

"That the respondent company could not absolve itself from its duty to take care of the boat by delegating that duty to another; that the liability of the respondent company does not rest upon the ground that the boat was injured by its servants, but upon the ground that it was injured by its subusers."

It further held that the defendant company was liable, not only for its own default or negligence, but for that of any person using property within its control. The court in that case cited and confirmed Hastorf v. Moore (D. C.) 92 Fed. 398, which was a libel in personam to recover damages from the respondent, as charterer, for an injury to a scow. The facts in the case were that the defendant's employés, who, under a charter, had control of the movements of a scow hired from the plaintiff for convenience in unloading, swung the stern inshore, where she grounded on some spiles and was injured. The court held the respondent liable, and that its liability was not relieved by the fact that the libelant had employed a boatman or scowman, who was present on board, but did not exercise any authority as to the movement of the scow, and had no knowledge of the presence of the spiles. The court (Judge Brown) said:

"By the charter or hire of the scow, she was under the direction and control of the respondent in discharging the stone; it was the respondent's duty to give her a safe berth, and any change of position for the purpose of unloading was within the control of the respondent, or of the person or persons with whom the respondent might leave the work of unloading. The plaintiff's man who was on board the scow could have had no object in hauling her back and inshore, and he had no previous knowledge of the ground. * * * The presence of the scowman, in my opinion, could make no difference in this responsibility, unless the removal were under his direction or with his acquiescence, with clear knowledge of the bottom. It was not his duty to examine the ground, nor was a removal by defendant's men, in the ordinary course of un-

loading, a change of place for which the scowman or the libelant was responsible."

Both the last two cases cited refer to Bouker v. Smith (D. C.) 40 Fed. 840, as a leading authority. This was a libel in personam to recover for two scows which were wrecked through the alleged negligence of the respondent while they were in his employ. The respondent was removing a life-saving station on Far Rockaway Beach by the use of the scows upon which the building was placed while being transported. The libelant's boats were hired for the purpose of performing the transportation. The respondent had previously engaged the small tugboat Kapella to take the scows, with the building, in tow by a hawser. The court (Judge Brown) said:

"The respondent was not an insurer nor a guarantor of the safety of the scows in letting them out for this service; the libelant took the risk of all sea perils, and all other dangers naturally incident to that service, except in so far as they might be brought about by the negligence and want of proper care and skill of the respondent or his agent, having reference to the nature of the enterprise. For such negligence or want of due care, the respondent would be answerable. * * * The burden of proof is upon the defendant to excuse it by showing that it did not arise through any lack of care, skill, or diligence in navigation."

Further, the court says:

"These complications and liabilities were well known and understood beforehand, and it was the respondent's duty to provide, first, the precautions against them, so far as practicable; and, second, a reasonable means of escape if the grounding should occur. These dangers were not part of the libelant's risk. If the liability to ground in that inlet from such causes was real, it was negligence to start out at a time when such grounding was certain, or liable to prove fatal, through the approaching storm. The respondent should have waited for weather that would give opportunity to extricate the tow from such probable mishaps. The tug was in the employ of the respondent, hired by the day; there was no independent contract between the tug and the defendant, such as to free the latter from the legal responsibility of a principal for the acts of the tug as respects the scows which he had hired. The respondent is therefore answerable to the libelants for the loss of the scows, either for starting at an improper time, in view of the difficulties, liabilities, and mishaps naturally attending such an enterprise, or for want of proper care and skill in the navigation of the tug to avoid grounding."

This case was affirmed by the Circuit Court of Appeals in the Second Circuit, 49 Fed. 954, 1 C. C. A. 481. Judge Wallace said:

"No one can escape from the burden of the obligation which rests primarily upon him by engaging for its performance with the contractor. Smith could not absolve himself from his duty as a bailee by employing Jaycox to perform any part of it. Although Jaycox was towing the scow with his tug by a contract with Smith, he was nevertheless performing Smith's implied contract, as were also all those who were employed for the time being by Jaycox."

Fox v. Damm (D. C.) 105 Fed. 254, showed the following facts: A charterer of a scow, which at his instance made a landing at an unusual place, received an injury from striking upon rocks near the shore, without fault of the master. And the court held that "the charterer must be held to have assumed the risk of the landing, and to be liable to the owner for the injury." The court further said, "The scow was taken to the place of landing by a tug that was employed by the

respondent, and was acting under his orders, and in that sense and to that extent the scow was in his charge."

In the Beard Dredging Company v. Hughes (D. C.) 113 Fed. 680, it was held, "Where a dredge, and three scows to be used in connection therewith, were chartered for three months, the charterer is liable for an injury to the chartered vessel through the negligence of a company which he hired to tow the same." The court said, "There can, I think, be little doubt as to the liability of the respondents for any injuries to the scows through negligent handling, whether caused by the respondents directly, or by a towing company employed by them, which is called an 'independent contractor.'" The case was affirmed by the Court of Appeals in 121 Fed. 808, 58 C. C. A. 192. The court placed its affirmance upon the fact that the tug was hired by the respondent to tow the scow, and that the respondent was liable for the acts of his employés. The court held that this was not to be distinguished from Gannon v. Consolidated Ice Company, 91 Fed. 539, 33 C. C. A. 662, cited supra.

In the light of the principles of admiralty law and of the teaching of the cases which we have cited, we are compelled to conclude that the respondent must be held responsible for the acts and defaults of the towboat company, and for any negligence on the part of that company, or its servants, in the performance of their duty. It might work great mischief to commerce and to the carrying trade if the court should hold that a consignee, who was under the duty of furnishing towage, could, by the employment of a towing company, relieve itself from liability for proper towage. If consignees could be so relieved, they could then employ incompetent tugs to render the service, and throw the hazards upon the vessel to be towed. This might result in great hardship. Owners of vessels are clearly entitled to protection in their contracts to carry cargo, with the agreement that the consignees shall furnish towage to and from their discharging berths. Charterers or consignees must be expected to know the hazards attending towage in their own localities and must also be expected to know the character of the towage service which they employ.

The court must next decide whether or not the towing company was negligent in the performance of the towage service. In The Somers N. Smith, recently decided, and cited supra, this court has quite fully considered the obligations of a tug in rendering towage service. In that case the court decided that a tug must be held to reasonable care in the conduct of her towage service, and that such reasonable care is measured by the dangers which she is encountering. We found, further, that, "if a locality is more than ordinarily dangerous, the tug is held to a proportionately higher degree of care and skill." It is unnecessary in the case at bar to cite the long line of authorities which we quoted in that case. There are certain decisions, however, which we have not discussed in The Somers N. Smith Case, which may be valuable for our guidance in this case. In The Harry and Fred (D. C.) 49 Fed. 681, the court, while dismissing the libel in that particular case, holds "that, in undertaking to tow a vessel over a bar for the first time, where the conditions of the towage are unknown to the tow, the captain of the tug is under the duty to examine the draft of the tow, and

128 F.—6

not to take her in tow if the water is insufficient." In the Robert H. Burnett, 30 Fed. 214, it was held "that the tug is required to have a knowledge of the condition of the bottom and of the depth of the water in the river she is navigating." In The Lady Pike, 21 Wall. 1, 22 L. Ed. 499, it was held "that owners of steamers undertaking to tow vessels are responsible for accidents, the result of want of proper knowledge, on the part of their captains, of the difficulties of navigation." In the Margaret, 94 U. S. 494, 24 L. Ed. 146, Mr. Justice Swayne, in delivering the opinion of the Supreme Court, said:

"She [the tug] was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either, in such cases, is a gross fault, and the offender is liable to the extent of the full measure of the consequences. * * * The port of Racine was the home port of the tug; she was bound to know the channel, how to reach it, and whether, in the state of the wind and the weather, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning; if what occurred was inevitable, she should have forecasted it and refused to proceed."

On this subject, also, we find instruction in The Merrimac, Fed. Cas. No. 9,478; Pettie v. Boston Towboat Company, 49 Fed. 464, 1 C. C. A. 314; Atlee v. Union Packet Company, 21 Wall. 389, 22 L. Ed. 619; The Burlington, 137 U. S. 386, 11 Sup. Ct. 138, 34 L. Ed. 731; The Kate Jones (D. C.) 91 Fed. 796; The S. W. Morris (D. C.) 59 Fed. 616; The Henry Chapel (D. C.) 10 Fed. 778. In the last case cited, Judge Nelson says:

"The rule of law is perfectly well settled that a tug undertaking to tow a vessel in navigable waters is bound to know the proper and accustomed waterways and channels, the depth of water, and the nature and formation of the bottom, whether in its natural state or as changed by permanent excavations."

As bearing upon the same subject, see, also, The Effie J. Simmons (D. C.) 6 Fed. 639; The Nathan Hale (D. C.) 91 Fed. 682; The James H. Brewster (D. C.) 34 Fed. 77; The Gypsum Packet Company v. Horton (D. C.) 68 Fed. 931. In The Zouave, Fed. Cas. No. 18,221, Judge Wilkins said:

"The tug is presumed, in the undertaking she makes, to know the channel and all its perils, and engages to take her tow line safely through; it comprehends knowledge, caution, skill, and attention."

In McMillan v. Moran (D. C.) 107 Fed. 149, a tug was held liable for bringing the masts of a vessel in contact with Brooklyn Bridge. Judge Brown said:

"I consider it only a reasonable duty of tug owners to keep their tugs supplied with local charts, and to take notice of the government reports and corrections for their information and benefit, and that in this case there was therefore negligence of the respondent in not apprising the tug captains of the corrections in the estimated height of the bridge above mean high water."

In the light of the principles of admiralty law, stated and enforced in the cases which we have quoted, the court must conclude that it is the duty of any one responsible for towage service to clearly know the channel in which the towage is to be performed, and all dangers attending such service. Did the captains of the towboats engaged in the service in the case at bar meet this duty? The Central Wharf

Towboat Company is shown by the testimony to be the only towboat company in Portland having tugs of sufficient capacity to tow a fully laden vessel of the size and character of the Marjory Brown into Back Bay. It does not appear from the testimony of the agent or of the manager of the company that they had any report in their office of the condition of the channel, or that personally they knew the nature of the bottom. Capt. Peterson, master of the Belknap, which was engaged in this service, testified that he had towed in and out of Back Bay 20 years, and that he first knew of this shoal some time last summer; that he then went in with the schooner J. S. Winslow drawing 20 feet 6 inches on a pretty high tide, and that he felt the Winslow touch; but that he never after that, made any soundings, and never made any effort to ascertain the depth of water over the shoal. Capt. Marshall, in charge of the Fannie G., says he was not familiar with the channel around there. Capt. McDuffie, who had charge of the towage service in the case at bar, is one of the most experienced captains in the service of the towboat company. He is clearly a man of great capacity and ability in his calling, and in frankness and clearness of statement is one of the best witnesses we have ever seen upon the witness stand. But the testimony shows that even Capt. McDuffie was not competently informed as to the location of the dangers in the channel where the towage service was performed. When a large vessel is placed in the care and custody of captains of the experience of the men we have quoted, those vessels have the right to feel assured that such men know the dangers of the towage service which they are undertaking, and that they will not undertake such service unless they can feel reasonably assured that they can perform it successfully. It is not sufficient for such men to say that they do not desire to assume any liabilities. If, in the case at bar, there was doubt as to their being able to tow a very deep draft vessel through the dangerous place, it was their duty to so inform the consignee; and it was then the duty of the consignee to see that proper lighterage service was performed, and the vessel thus made capable of being safely towed. The case shows that this was the largest draft vessel that had ever been brought to this dangerous place by this towboat company. The law, as we have already said, makes it incumbent upon those undertaking to render towage service to know the draft of the vessel, and to know whether she can reasonably be expected to be towed through the dangerous place under consideration. Without commenting further upon the details of the testimony, the court finds that the evidence shows that the captains of the tugs of the towboat company did not sufficiently and competently know the bottom of the place where the towage service was to be performed; that they did not know the channel, nor the peculiar dangers attending the towage; and that they did not exercise reasonable care in the conduct of the towing, or in their undertaking to haul the tow from the obstruction upon which their lack of knowledge had placed her. Mr. Both, the assistant United States engineer, has testified as to the soundings in the place where the towage was performed, and has shown further that he had proper surveys of the place in the office of the United States engineer. Under the doctrine of McMillan v. Moran, supra, it was the duty of the towing company to have availed itself of knowledge so

easily within its reach. In the attempt to jump the vessel over the spot where she had grounded, there was clearly a lack of proper knowledge; there was a want of judgment on the part of the towboat captains; for this fault of judgment we cannot hold them to the high degree of culpability to which they must be held for their initial fault in not knowing precisely the dangers which they were encountering in undertaking the towage service. If they knew those dangers to a vessel of so heavy draft, it was their duty, as we have said, to inform the consignee, in order that such vessel might be properly lightered, and so brought over the dangerous spot in her lighter condition.

In The Julia Bailey, which we have cited in The Somers N. Smith Case, supra, Judge Webb, in an unpublished opinion, says:

"The slightest departure from the highest skill and care is almost certain to be attended with loss, and, although the mere fact of trouble raises no presumption of fault, it does call for the sharpest scrutiny of all attending circumstances."

The court must find that the fault in this case, which led to the injury, was the same as in the case of The Somers N. Smith, where we said:

"The court is of the opinion, from the preponderance of evidence, that the principal cause of the stranding of the schooner was that the master of the tug, although he had had many years' experience in towing vessels at this point, did not know the channel."

After reviewing in detail the testimony as to the stranding in the case at bar, we think the fault for such stranding is that of the towboat company undertaking to render the towage service, and employed for that purpose by the consignee.

There has been some testimony as to a contract of exemption made by the towboat company. Without entering into the details of testimony upon this point, we do not find sufficient evidence to prove such contract. It is therefore unnecessary for us to decide what, under the peculiar circumstances of the case at bar, would have been the legal effect of such contract of exemption, if it had been proven. We have, however, fully discussed this question in The Somers N. Smith Case, cited supra. We held in that case that a contract that a vessel was to be towed at the risk of her owners would not relieve the tug from liability for the consequences of her failure to exercise reasonable care and skill in the performance of the service.

Having found that the respondent is in fault, it is the duty of the court to inquire whether the case shows any fault upon the part of the libelant. We do not find that there was any such fault on his part. It is clear from the testimony that he was not informed of the situation; he had never been in Back Bay before; he knew nothing of the location of the place where the towage was to be performed; he did not direct that the vessel should be towed, or do anything further than follow the orders of the captains rendering the towage service. Capt. McDuffie, in his clear, frank way, says, "Captain Thompson gave no orders, but followed my orders." He was not informed of the depth of water, the nature of the bottom, or the location of the channel. He had a right to assume that the respondent and the tugboat people were fully informed of the perils to which a large vessel would be subject

in going into Back Bay, with all the dangers of that location, on a low run of tides. In White v. Steam Tug Lavergne (D. C.) 2 Fed. 788, Judge Choate said:

"The master of a towed boat is not chargeable with contributory negligence in acquiescing in the exposure of such boat to an unnecessary peril by the tugboat pilot, unless the danger about to be incurred is very obvious."

In the case at bar, the towboat company is not made a party to the suit by the libelant, and has not been brought into the suit, under the admiralty rules, by the respondent, so that we cannot consider or pass upon any questions which may arise between the respondent and the company which rendered the towage service.

The conclusion must be that the libelant· is entitled to hold the respondent accountable for the damages sustained and for balance of freight. Decree for libelant; Fritz H. Jordan appointed assessor.