## UNITED STATES v. ATLANTIC REFINING CO.

Civ. A. No. 10433.

United States District Court
D. New Jersey.

Dec. 28, 1951.

Grover C. Richman, Jr., U. S. Atty., Newark, N. J., for libelant. William H. Postner, New York City, of counsel.

Otto Wolff, Jr., Philadelphia, Pa., for respondent.

FORMAN, Chief Judge.

On October 31, 1945, libelant, United States of America, through the War Shipping Administration by Tankers Company, Inc., entered into a tanker charter party with the respondent, The Atlantic Refining Company, a corporation having its office and place of business in Newark, New Jersey, wherein, among other things, it was agreed in Part I of said charter party that the libelant's vessel the S.S. Quemada Lake should transport the respondent's cargo of crude oil to be loaded at one or more of the

U. S. Gulf Coast ports and discharged at one or more of the Atlantic Coast ports. The freight rate was to be according to the War Shipping Administration maximum and surcharge as of completion of loading.

Under the heading "Special Provisions" the charter party contained the following:

"2. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to the next berth, charges for running lines on arrival at and leaving that berth, wharfage and dockage charges at that berth, additional agency charges and expenses, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in W.S.A. Rate Orders and Rate Advices.

\*   \*   \*   \*   \*   \*

"Hours for loading and discharging and demurrage rate per hour shall be in accordance with the published War Shipping Administration terms and rate applicable on this size vessel as on the date of loading."

In Part II of the said charter party, among others, the following provisions appear:

"1(a).—The Vessel, classed as aforesaid and to be so maintained during the currency of this Charter, shall with all convenient dispatch, proceed as ordered to Loading Port or so near thereunto as she may safely get (always afloat), and being tight, staunch and strong, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's control excepted, that shall load (always afloat) from the factors of the Charterer a full and complete cargo of Petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her tackle, apparel, stores and furniture (sufficient space to be left in the expansion tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, to Discharging Port, or so near thereunto as she may safely get (always afloat), and deliver said cargo. The freight shall be at and after the rate stipulated in Part I hereof, based on intake quantity as shown on the Inspector's Certificate of Inspection, the services of the Petroleum Inspector to be arranged and paid for by the Charterer who shall furnish the Owner's Agent with a copy of the Inspector's Certificate. No deduction of freight shall be made for water and/or sediment contained in the Oil.

\*   \*   \*   \*   \*   \*

"4. Notice of Readiness.—The Master or his representative shall give the Charterer or his agent at the ports of loading and discharge notice in writing during the ordinary business hours that the Vessel to load or discharge cargo, berth or no berth, and lay time shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i. e., finished mooring when at a sealoading or discharging terminal, and all fast when loading or discharging alongside a wharf), whichever first occurs; provided, however, that where, because of routing instructions or other orders of the Owner over which the Charterer has no control, delay is caused to the Vessel for more than six (6) hours after notice of readiness is given, in waiting turn to load or dis-

charge, lay time shall not commence until Vessel is berthed.

"5. Hours for Loading and Discharging.—Such number of running hours as are stipulated in Part I hereof shall be allowed the Charterer as lay time for loading and discharging cargo, but if the Vessel's condition or facilities do not admit of loading and discharging in the time allowed, then the additional time necessary therefor shall be included in lay time. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as usual lay time, if the Charterer, Shipper or Consignee prohibits loading or discharging at night, time so lost shall count as used lay time.

\* \* \* \* \* \*

"10. Demurrage.—Charterer shall pay demurrage per running hour and pro rata for a part thereof stipulated in Part I for all time that loading and discharging and used lay time as elsewhere herein provided exceeds the allowed lay time herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge because of fire or explosion in or about the plant, or because of breakdown of machinery of the Charterer, shipper or consignee of the cargo, the rate of demurrage shall be reduced to one-half of the rate stipulated in Part I hereof per running hour and pro rata of such reduced rate for part of an hour for demurrage so incurred.

\* \* \* \* \* \*

"20(a). Act of God, etc.—The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from—any act, neglect, default or barratry of the Master, pilot, mariners or other servants of the Owner in the navigation or management of the Vesssel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding, or peril, danger or accident of the sea or other navigable waters, saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defects, quality or vice of the cargo; any act or omission of the Charterer or Owner, Shipper or Consignee of the cargo, their agents or representatives; insufficiency of packing or inadequacy of marks, explosion, burning of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery, unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied, or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or failure in performing hereunder, arising or resulting from:—Act of God, act of war, act of public enemies, pirates or assailing thieves, arrest or restraint of princes, rulers of people, or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout, or stoppage page of restraint of labor from whatever cause, either partial or general; or riot or civil commotion."

Rate Order No. 394 of the War Shipping Administration, approved October 12, 1945, governed rates, lay time and demurrage and in so far as this suit is concerned the following provision is pertinent:

"Lay Time and Demurrage:

"Time allowed for loading and discharging, 72 hours.

"Demurrage rates per hour: Vessels of 8,999 D.W.T. or less, $50.00; \* \* \* vessels of 14,000 D.W.T. and over, $120.00.

"Saturday afternoons, Sundays or holidays not excluded (whether used or not) when figuring used lay time."

The S.S. Quemada Lake, hereinafter called the vessel, was of approximately 16,000 dead weight tonnage. Therefore demurrage on her would be at the rate of $120 per

hour. Libelant charges that respondent violated the terms of the charter party by consuming lay time in excess of its allowance of 72 hours which, in the aggregate at the port of loading and the port of discharge, amounted to 124 hours and 55 minutes. At the demurrage rate of $120 per hour it demands the sum of $14,990 in the first count of the libel and in the second count thereof seeks to recover costs and attorneys' fees.

Respondent designated as the port of loading Atreco (Port Arthur) Texas and its pier at its terminal at Fort Mifflin Philadelphia in the Delaware River as the berth and port of discharge.

The vessel arrived at Atreco and made fast at the wharf on November 11, 1945, at 12:30 p. m. It finished discharging ballast during the afternoon and commenced loading its cargo at 6:20 p. m. At 10:50 p. m. the loading was interrupted by the respondent's employees because a water barge with an open gasoline engine came alongside the vesssel and the employees of the respondent refused to load cargo while the barge was present so that the loading was not resumed until the barge departed next morning, November 12, 1945, at 7 a. m. The loading was completed that day at 12:30 p. m. and the hoses were disconnected at 2:50 p. m.

The vessel proceeded without untoward incident toward her destination, the Fort Mifflin terminal of the respondent, and arrived at the Overfalls Lightship on November 17, 1945 where a pilot was picked up. It proceeded up the Delaware River to the Mantua anchorage about a mile south of Fort Mifflin where it came to anchor early in the morning of November 18, 1945. Here the pilot departed from the vessel, which awaited the arrival of another pilot and tugs to tow her to her berth at the respondent's Fort Mifflin pier but these did not arrive owing to a strike of the tugboat employees.

It was not until November 24, 1945, that United States Navy tugs towed the vessel from the Mantua anchorage with a pilot aboard her to the Fort Mifflin pier where she made fast at 7:45 p. m. This action was taken by the Navy because the vessel was committed to transport for it another cargo of oil from a neighboring company on a long voyage as soon as she had discharged the cargo of the respondent. The discharge of the cargo was commenced at 11:20 p. m. of November 24, 1945 and completed by 5:00 p. m. the following day, November 25, 1945, with hose disconnected at 5:35 p. m. The next morning, November 26, 1945, at 7:25, she cleared her berth at respondent's pier.

Actual loading time at Atreco, Texas was 21 hours and 10 minutes, including an interruption of 8 hours and 10 minutes while a water barge was alongside the vessel with her gasoline engine in operation, responsibility for which is disputed by the parties. Actual discharging time at Fort Mifflin terminal was 18 hours and 15 minutes, including 4 hours of waiting for pumps to start. Total time for both actual operations was 39 hours and 35 minutes.

The main question presented is whether the respondent should be held responsible for the delay which ensued while the vessel lay at the Mantua anchorage from November 18, 1951 until November 24, 1951 when she was moved to the respondent's dockside.

The respondent denied any liability for the delay stating that its designated terminal was a "safe place or wharf" to which the vessel should proceed, lie at, and depart therefrom, always afloat, and asserting that whether or not tugs were necessary that it was libelant's obligation to take the vessel to the wharf under the terms of the charter party; that the latter did not require respondent to furnish tugs to assist the vessel to maneuver to respondent's wharf; that written notice of the vessel's readiness to discharge her cargo was not actually received by respondent pursuant to the requirements of the charter party until November 23, 1945 and that if oral notice was given it was in no event binding on respondent since if it was received at all, it was by an employee of the company who had no authority to waive any of the provisions of the charter party on respondent's behalf; and finally that in the even that tugboat service was necessary to assist the vessel to the wharf and if there was a tugboat strike then respondent was

absolved from providing tugboat service under the exculpation clause of the charter party, paragraph 20(a), heretofore quoted.

It is well recognized that demurrage is extended freight and that the risk of vicissitudes which prevent the loading or discharge of cargo within the stipulated lay days lies unconditionally with the charterers. Yone Suzuki v. Central Argentine Ry., 2 Cir., 27 F.2d 795; The Marpesia, 2 Cir., 292 F. 957. But, this absolute liability to pay demurrage is subject to three exceptions: (1) specific exonerating clauses in the charter party; (2) the delay being attributed to the fault of the shipowner or those for whom he is responsible; and (3) a vis major amounting to "a sudden or unforeseen interruption or prevention of the act itself of loading or discharging, not occurring through the connivance or fault of the charterers." Crossman v. Burrill, 179 U.S. 100, 21 S.Ct. 38, 42, 45 L.Ed. 106; see also, The Marpesia, supra.

There is no question of vis major involved here for it can hardly be claimed that the strike referred to in the proof (particularly in view of the contention of respondent) was so unusual, extraordinary and unexpected a circumstance as to be equivalent to vis major.

Respondent contends, assuming arguendo, that the vessel required the assistance of tugboats in order to dock at the Fort Mifflin terminal, and was unable to obtain tugboat assistance because of a strike, the respondent would not be answerable for the resulting delay for the reason that Clause 20(a) of Part II, the general "strike exception" clause of the charter party is a complete and sufficient excuse. However, it does not appear that respondent's exculpation would be so justified particularly in the light of the specific limitations in the demurrage clause (10). In an analogous situation in the case of Continental Grain Co. v. Armour Fertilizer Works, D. C., 22 F.Supp. 49, 53, the court said:

"The general 'strike exception' clause in the charter party does not prevent the running of demurrage; some similar phrase is necessary in conjunction with the demurrage clause to free the charterer from the burden of paying demurrage when the delay is due to strikes, etc.

"A review of the cases, wherein the courts have held that charterers were not liable for demurrage for delays due to strikes, reveals that, in addition to the general 'strike exception' clause, the charters also contained stipulations exonerating the charterers from liability, for demurrage when the delay was due to strikes, riots, etc., said stipulations being incorporated in or appurtenant to the 'lay day' or 'demurrage' clauses of the charter parties." [Cases cited.] See also Yone Suzuki v. Central Argentine Ry., supra.

But the contention of the respondent that the delay was due to the fault of the libelant or those for whom it is responsible seems to have force in its favor.

Under the charter party in this case it was the duty of the respondent to select and designate a safe and proper place for the discharge of the cargo; not only a place safe for the vessel to lie after it was reached, but one which could be safely approached. On the other hand there was imposed on the master the duty of bringing his vessel to the berth indicated and any delay, in so doing, that arose not from the unsuitableness of the berth or its approaches,[1] or the fault of the respondent would be imputable to the master. See Smith v. Lee, 1 Cir., 1895, 66 F. 344.

According to the testimony of Mr. A. P. Smith of the Operating Department of the Lavino Shipping Company, subagents of the libelant, he notified Mr. Frank Webb, the respondent's Superintendent of Bulk Loading and Unloading by telephone of the vessel's arrival at the Mantua anchorage on Sunday, November 18, 1945, and spoke of

---

1. Even though the master is responsible for bringing the ship to its berth, if the Fort Mifflin wharf had been inaccessible without the assistance of tugboats, and a tugboat strike had intervened, it would appear that under the charter the demurrage would not stop running.

the inability to procure tugboats to tow the vessel to the pier. This notification was confirmed in writing by Mr. Smith in a letter which he addressed to the respondent on November 21, 1945, which the respondent claims did not come to its attention until November 23, 1945, the intervening November 22, 1945, being Thanksgiving Day.

Mr. Smith also testified that he made efforts to secure tugboats for the vessel from three towboat firms and that he also endeavored to secure a pilot for the vessel, all to no avail on account of the strike. He further gave evidence that from his personal observations on the Fort Mifflin wharf of the respondent, tankers of the type of the vessel always docked with the assistance of tugs.

The master of the vessel testified by deposition on the part of the libelant that his owner's agents were notified as he brought the vessel to the Delaware Breakwater, that he expected its agents to provide the vessel with pilot and tugs to dock it; that he was unfamiliar with the Fort Mifflin terminal, believing its length to be only 250 feet; that he was unaware of the depth of the water at the respondent's wharf although he assumed his charts would show it; that he would not under any circumstances assume the hazard of taking the vessel to the wharf without tugs and in any event he held no license as a pilot of the Delaware River.

Controverting libelant's evidence respondent made it appear that its Fort Mifflin terminal wharf ran about 950 feet broadside of the river and that the vessel was less than 600 feet in length. Her mean draft was 29' 5" as she lay at the anchorage and charts indicated that there was no hazardous lack of water for the docking of the vessel. There were no abnormal weather conditions present.

Mr. Webb conceded that Mr. Smith had talked with him by telephone on Sunday, November 18th, at about ten in the morning and that he reported the arrival of the vessel and her location in the Mantua anchorage as well as his difficulty in procuring tugboats due to the strike. No request was made by Mr. Smith for respondent to furnish towboat service.

Both Mr. Webb and Captain Nelson, Assistant Port Captain of the respondent, testified that tankers of the type of the vessel were often docked at the Fort Mifflin pier by their masters or by pilots without the assistance of tugboats.

The respondent also introduced the evidence of Captain Campbell, President of the Pilots' Association with many years experience as a Delaware River pilot. He testified that it was not necessary to employ tugboats to assist vessels to the wharf of the respondent; that since it was parallel with the river it was easy, given knowledge of tide and wind, to take a vessel to the wharf and dock her; that he knew that the respondent did on occasions use tugs to assist vessels to the wharf but this was only done to gain time in unfavorable tide situations.

He also testified that during the tugboat strike in question 60 pilots in the association were available for assignment to vessels during all 24 hours of the day and that despite the strike pilots took vessels close enough to docks during the strike to get a line to the wharf although they did not actually dock a vessel and that this was substantially in accord with their usual custom and practice.

The disinterested testimony of Captain Campbell alone is convincing that the respondent had furnished a safe berth at which libelant could have docked the vessel with the exercise of only reasonable diligence. The libelant and those for whom it was responsible simply did not exert themselves sufficiently. The libelant was chargeable with the master's lack of qualification to take the vessel farther up the Delaware River than from the Overfalls Lightship and the evidence appears conclusive from Captain Campbell's testimony that the master's deficiencies in this respect could have been readily supplemented. The fault for the delay was upon the libelant. Since the loading and discharging was accomplished well within the 72-hour allowance for lay time, otherwise, there can be

no recovery for demurrage as demanded in the first count of the libel.

The claims for attorneys' fees and costs under the second count of the libel must fall with this disposition of the claim for demurrage under the first count.

A decree should be taken in favor of respondent dismissing the libel.