BROWN et al. v. CORNELL STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. February 25, 1903.)

No. 35.

1. TUG AND TOW — LIABILITY OF TUG FOR LOSS OF TOW — TOW WITHOUT ANCHOR.

In a northeast storm of extraordinary violence, in the night, libelants' scow, which was loaded with stone, and had been placed in a fleet in the Hudson river off Haverstraw, broke adrift, and was injured upon the rocks. She had no anchor, and had been made fast to another scow. The fleet had been made up by respondent's tug in the afternoon and evening, with the purpose of starting down the river at 9 o'clock that night. The tug then went to Grassy Point to await the time for starting. The weather had been threatening during the afternoon, with snow, but was not so dangerous as to render it negligence for the tug to assemble the fleet. About 8 o'clock the wind and snow increased so

as to render it dangerous to start with the fleet, and also to approach the fleet in the darkness, and the tug remained away. There was no safe harbor for boats at the place during easterly storms, and it was the practice to allow scows, when so made up into fleets, to ride out storms in the open bay, which they had always previously done in safety. *Held,* upon findings that, owing to the snow and darkness, it would have been dangerous for the tug to approach the fleet at any time after 8 o'clock, and that the master had no knowledge that libelants' scow had no anchor, as it was her duty to have, that the tug was not negligent, nor liable for any part of the damage.

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 110 Fed. 780.

This cause comes here upon appeal from a decree which awarded half damages to the libelants for an alleged breach of a contract of towage, as a result of which their scow No. 31 suffered loss and damage in a storm in Haverstraw Bay on the night of November 26, 1898.

J. P. Kirlin, for appellant.

John T. Foley, for appellees.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. Libelants' scow had been loaded with stone at Brown & Fleming's dock, about a mile above Verplanck's Point, and towards evening was taken from there by one of the respondent's tugs and towed over to a place off Grassy Point where tows were usually made up preparatory to being taken to New York. The captain of scow 31 describes the making up of the fleet as follows: The respondent's tug Townsend, just as it was beginning to get dark, took him over Haverstraw Bay to the usual meeting place, where he found four other boats—two brick barges ahead, and a brick barge and the stone scow Katie D. behind them. He made fast to the stern of the Katie D. This he puts at about 6 o'clock, or a little after. It was expected that the tug would start downriver with the fleet at high water, about 9 p. m. Having brought No. 31 to the fleet, she left them, and went to Grassy Point, about one-fourth mile distant, partly to tie up there until the hour of starting, and partly to inquire for other boats. After No. 31 joined company, only one more boat came, the Gladys, which lay alongside of her, tailed to one of the brick barges, the Star, which was there when she came. The Gladys was brought out by a small tug of the respondent, the Ingalls, some time between 8 and 9 p. m. There is conflict in the testimony as to the time at, and the order in, which the various boats arrived, but the captain of the libelants' scow is so clear and positive in his statements above given—he was repeatedly asked about them—that we are inclined to accept his account. Starting as he did before and arriving after dark (after a course of more than three miles), he was more likely to note the time accurately, through the circumstance, than would those on other boats, which were moved only a few hundred yards after darkness had once set in. The position of the various craft making up the flotilla, with No. 31 and the Gladys

in the last tier, corroborates him strongly. At the time the tow was thus made up by the addition of the Gladys, the entire flotilla was held by the anchor of one of the leading stoneboats. Apparently that was sufficient to hold them in good weather, and, with only one anchor down, the flotilla was in better shape to receive the tug when it should return at high water to take them down the river, and avoided risk of fouling when the tide turned.

When scow No. 31 was taken from Verplanck's Point, about 5 p. m., the weather was threatening. It had begun to snow about 2 p. m., the wind being to the northward and eastward. By the time she was made fast to the flotilla the storm had increased and become more threatening, but apparently no one apprehended that it would become too severe to start at high water, as planned; and, when the tug left the flotilla, her master said he would be back in about two hours. The District Judge finds that:

"By the records of the nearest station of the Weather Bureau, the wind increased from 16 to 19 miles between 4 and 6 o'clock, to 26 miles between 7 and 8, to 27 miles from 8 to 10 o'clock, to 34 from 10 to 11, and to 48 from 11 to midnight; continuing about the same all the next day."

The maximum velocity was 54 miles from 11:13 to 11:45. The storm that thus raged over the bay was one of most unusual severity. When it ceased, more than 25 wrecks were scattered along the banks of the Hudson. It was not a local storm, but extended down the New England coast. A year later it was described in periodicals as "The Great November Storm of 1898."

The six boats of the flotilla hung on the single anchor of the Lizzie and Louise until after 11 o'clock, when, the flotilla having turned with the tide, the Washburn put down one of her anchors. Subsequently, when she had drifted about a quarter of a mile, and was ashore in the mud, she put down the other. At about the time the Washburn put down her first, anchor word was passed that the boats behind must cast off their lines, as they could not be held together any longer. The scow Star, which was astern of the Washburn, dropped back, and, putting out her own anchors, rode out the storm in safety. The Katy D. had but a small anchor, and therefore slacked off her lines and hung onto her two leaders. None of the flotilla except the Gladys and No. 31 sustained any material damage. The captain of No. 31 objected to letting go, as he had no anchor. The Gladys volunteered to take a line from him, and, after they were made fast together, both boats cut loose from the Katy D. and the Star, and began to ride on the single anchor of the Gladys, which was then put overboard. The anchor of the Gladys held for about an hour, but finally proved insufficient for both vessels, and they drifted shoreward together. The Gladys foundered. Her crew abandoned her and went on board No. 31, which finally fetched up on shore, some distance below, at about 2 a. m.

There is no harbor for boats in Haverstraw Bay, with a northeast or southeast wind, and at times they are obliged to ride out storms in the open bay. If, after the fleet is made up in the manner described, heavy weather comes on, which makes it unsafe to proceed with the tow to New York at the expected time, the practice has al-

ways been to leave the scows riding at their anchors at the place where the tow is made up. In storms of exceptional severity, the boats, by slacking their own lines, drop apart, and each one rides at its own anchor. No instance previous to the one in question has been mentioned in the testimony where any barge thus left at anchor in bad weather has gone ashore or suffered damage.

The master and pilot of the tug Townsend, after making their inquiries about other boats at Grassy Point, returned to their tug about 8 p. m. They found that—

"The wind had so much increased, and that the snow was so thick, as they testify, that they could not see the boats at anchor, and did not know where to find them; and on consultation they agreed that it would be dangerous to start down river with the tow, as expected; and accordingly, without any further attention to the tow, they lay at the dock at Grassy Point until about 1 a. m. when, in consequence of the violence of the storm, and injuries to the tug by pounding there, the tug left Grassy Point and made her way to Verplanck's Point, where she passed the rest of the night without further damage."

The District Judge held the scow in fault for not having any suitable anchor on board. We concur in his conclusion, that "if she had had a suitable anchor, as the rest of the fleet had, it is not probable that either the Gladys or No. 31 would have suffered serious damage." From this finding of negligence the libelants have not appealed. He further held that there was no negligence attributable to the tug, either for taking the scow from Verplanck's Point dock to the flotilla, or for determining, when the storm increased, not to start out with the tow. The tug was held in fault, however, for not returning to the tow about 9 p. m., finding out that the scow had no anchor, and taking her back to "partial protection" on the south side of Verplanck's Point. We do not understand that the District Judge suggested that the flotilla could have been towed by the Townsend against the gale across the bay in safety. Certainly the evidence would warrant no such finding. But it was held that "on going to the tow, and upon finding that the tow had no anchor, the tug should have taken her to a less exposed place, if this was possible."

It may be noted that on the easterly shore the only sheltered place south of the point is a cove where the depth of the water is but 4 to 6 feet (No. 31 drew 10 feet), and without an anchor the tug could not have been kept in the mouth of the cove, where the water is deeper. The evidence of disinterested witnesses shows that it would have been most hazardous to undertake to haul her up the river to the dock from which she had been taken. Moreover, by the time the gale had begun to rage fiercely it would have been perilous for the Townsend, unable to make out lights through the thickly falling snow, to start athwart the wind, searching for the boats. There was great risk of collision with them, or of stranding the tug herself on the mud flats. The conclusion of the District Judge was evidently influenced by two findings of fact in which we are unable to concur. He finds that her master knew or ought to have suspected that the scow had no anchor. The master testified most positively that he had not the slightest intimation until after the accident that the scow had no anchor. It is true that, in response to a question, he says

he did not see an anchor on board of her. Of course, if none were there, he couldn't see one, but this answer in no way imports that he had looked to see whether she had an anchor or not. It in no way conflicts with his testimony that he had no intimation that this necessary part of her equipment was lacking. The District Judge further finds that the weather was such that the Townsend could have gone to the tow between 8 and 9 p. m. "without danger or difficulty, as the tugs Mabel and Ingalls went between these hours with additional scows, and placed them in the tow." We are satisfied that the preponderance of the evidence is the other way, as before pointed out, and that all the boats were in the flotilla before No. 31 arrived, except the Gladys, which was brought by the light-draft tug Ingalls a few hundred feet only from her anchorage near the flotilla.

We are of the opinion that, until the gale became so severe as to induce a reconsideration of the decision to start for New York at high water, there was no occasion for the Townsend to keep in the immediate vicinity of the anchored tow, and that, when that decision was arrived at, the condition of the weather was such that it was highly problematical if she would not have done more harm than good by undertaking to find the flotilla in the darkness on a lee shore. We are not prepared to hold the master in fault because, in the exercise of his best judgment, he decided not to hunt for the tow. In the exceptional character of the storm, and the negligence of the owner of the scow in not equipping her with anchors, we find enough to account satisfactorily for this accident, without holding the tug in fault.

The decree of the District Court is reversed, with costs, and cause remanded, with instructions to dismiss the libel, with costs.