THE FLUSHING.

(District Court, E. D. New York. February 8, 1908.)

TOWAGE—LOSS OF TOW—LIABILITY OF TUG.

Libelant engaged respondent tug to tow a scow from New York to Larchmont Harbor, Long Island, where her cargo of dirt was to be delivered to a dredge. The scow was taken in tow about noon, but did not reach the harbor until after dark, and was then anchored by the tug, which proceeded with another tow, and then to her anchorage. During the night a hurricane arose, and the scow dragged her anchor and was wrecked on the shore. Libelant alleged that the loss was due to the fault of the tug in not starting with the tow earlier, in leaving her anchored outside the harbor in a dangerous place, and in failing to stand by or come to her assistance. The claimant claimed, on the other hand, that the scow was left inside the harbor at the place called for by the contract and that the towage was finished. *Held*, on conflicting evidence, that the burden of proof resting on libelant was not sustained on either ground; it further appearing that when the scow was left the weather was fine, and there were no indications of a storm, and no warning of it had been given by the Weather Department when the towage was begun, and that after the storm commenced the tug could not have gone to the assistance of the scow.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 36.]

In Admiralty.
Foley & Martin, for libelant.
James J. Macklin, for claimant.

CHATFIELD, District Judge. The libelant has not sustained the burden of proof which rests upon her. Diametrically opposite state-

ments of the occurrence upon which the libel is based are shown by the testimony produced.

The libelant's story is that upon the 19th of December, 1905, one William V. O. Driscoll, an agent of the libelant, who was the owner of the scow Driscoll, made an arrangement with the owners of the steam tug Flushing to tow a load of cellar dirt from New York to Larchmont Harbor, to the dredge of one McSpirit, at a place called "The Hammocks," at the head of that harbor; that upon the following day, about noon, the tug Flushing took in tow the scow, loaded with dirt, and, having started too late to reach the dredge before dark, the captain of the tugboat left the scow at anchor near the outer end of the Larchmont Breakwater, and practically in the open waters of Long Island Sound, while the Flushing took a barge filled with coal to Mamaroneck, some distance beyond; that the captain of the Flushing promised the scowman at the time of leaving the scow at anchor to return the following morning and take the scow to its place of destination. The libelant further claims that the captain of the scow called the attention of the captain of the tug to a dark cloud in the southeast, and asked as to the safety of the anchorage through the night; that assurances were given by the captain of the tug that the place of anchorage was safe; and that at this time a moderate breeze was blowing from the southeast. About 11 o'clock the wind freshened into a violent storm from the same direction, and the scowman worked until 5 o'clock the next morning, when the scow, under the influence of the wind, which was still blowing, was carried upon some rocks, and then upon the shore, some quarter of a mile south of the Larchmont Clubhouse, but in the same indentation or cove upon which the clubhouse is located. The scow was wrecked, a portion of her cargo lost, and the libel has been filed for the damages resulting from what is claimed to be negligent towing, in that a start was not made at such an hour as to allow sufficient time to reach Larchmont Harbor before dark, that there was a failure to stand by the scow after anchoring, neglect in anchoring the scow in an unsafe place, in not maintaining a proper lookout for changes in the weather, and in not going to the aid of the scow when the storm arose. Testimony was further offered to show that upon the following morning a tug of the same fleet as the Flushing attempted to enter Larchmont Harbor, but was unable to or did not do so; and it is claimed by the libelant that the entire trouble was caused by the desire on the part of the captain of the Flushing to take the barge which he had in tow to Mamaroneck, and that he endeavored to save the time and avoid the risk which would have been necessary in towing the scow Driscoll to a safe anchorage further in Larchmont Harbor.

The claimant offers evidence to show that the original arrangement (some previous conversation having been had as to these several dredging operations between the owners of the scow and the owners of the tug) was to tow the scow of cellar dirt to the neighborhood of the dredging operations in Larchmont Harbor, and that the instructions given to the captain of the tug were to take the scow to Larchmont Harbor, to a point where she could be kedged or warped into the position desired for delivering her load of dirt; that the towing opera-

tion began about 1 o'clock on December 20th; that under the influence of a flood tide the tug towed the scow, in company with a barge loaded with sewer pipe, up the East river, arriving at Larchmont Harbor in the neighborhood of 6 o'clock; that the tug took the scow into Larchmont Harbor some half or three-quarters of a mile, and left it at anchor in about 12 feet of water, it being then high tide, in the neighborhood of or opposite to Rock Island, as shown upon the government chart; that the tug then turned around, went out of the harbor, took the load of sewer pipe to Mamaroneck, and eventually arrived at the float where the Red Star tugs were accustomed to tie up for the night at City Island, on the opposite side of Long Island Sound, and some distance further west or back toward New York City; that in the neighborhood of 11 o'clock upon the night of December 20th a hurricane or storm of unusual violence from the northeast descended, not only upon this portion of the Sound, but upon the entire region generally, and that from then on until the morning of the 21st the wind continued or increased in velocity and blew at such a rate that the Flushing was unable to proceed east in Long Island Sound, while a larger tug of the same company, attempting to proceed eastward, was compelled to turn back at the mouth of Larchmont Harbor. The captain of the Flushing further testifies that he made no attempt with the Flushing to return, that he had made no promise to the scowman to do so, and that he completed the towing of the Driscoll and left her at a point in Larchmont Harbor, which complied in every way with his instructions to tow the scow to the dredging operations in that harbor.

The general storm from the northeast, with a high velocity of wind, is clearly shown by the records of the weather observer of the United States for this region, and an added fact of significance is that the fall of the barometer did not precede, but was contemporaneous with, the storm itself. It is difficult to believe the story of the captain of the Flushing upon all points, inasmuch as he testifies that he did not know anything about Larchmont Harbor beyond the Yacht Clubhouse; that it was dark, and that he could see no lights; that he did not study the chart, had never heard of McSpirit's dredge, and did not know where it was located, nor see any of its lights, nor hear its whistle. To further add to the perplexity of the situation, the scowman testified that his scow drifted, under the influence of the wind blowing, in the same direction through all its wanderings, and finally brought up in a different cove from that where it certainly was found. The two points, where he locates the anchorage, and where he locates the scow as bringing up, are on a line running approximately southeast by northwest, and it will be remembered that he testified that this occurred under the influence of a southeast wind; while the place indicated by the captain of the Flushing as the point of anchorage is almost directly northeast of the point where the scow was found upon the shore, and the captain of the Flushing and the witnesses on the part of the claimant all testify that no wind blew from any direction except the hurricane from the northeast.

This peculiar and apparent massing of testimony according to inconsistent theories necessarily indicates the influence (probably unconscious) upon the recollection of the witnesses of a study of the chart

and a discussion of what happened. It is unnecessary to more than state the proposition that a tug is bound to know the channels, the depth of water, the risks which she undertakes; that she is under obligation to use skill, caution, and attention to her duties; and that she is responsible for the care of the boat which she is towing until the destination is reached, in so far as that care is dependent upon the skill, knowledge, and attention with which she and her officers perform their work. These various duties and responsibilities are set forth at length in the case of Thompson v. Winslow (D. C.) 128 Fed. 73, as shown by the numerous cases therein cited. It is with a full appreciation of the duty resting upon a tug undertaking such a towing contract that the conflict in the evidence in this case has been considered. Numerous inconsistencies, and either impossible or extravagant statements of the witnesses on both sides, lead the court to the conclusion that the story of neither is correct in its entirety; and it has been necessary, therefore, to work out what must have happened upon the night of December 20th before passing upon the responsibility of the claimant for the injuries which resulted to the Driscoll at that time.

Some items of the testimony must be taken up in detail, in addition to those already referred to; and, first, the testimony of Hendrickson, the scowman, to the effect that he was a mile or three-quarters of a mile from the nearest land, which would put him well out in the Sound and at least half a mile beyond the end of the breakwater; that the tug went right out into the Sound, and not back upon her course; that he saw no red light, although he places the point of anchorage, on the chart, within 400 or 500 feet of the end of the breakwater, where the red light was maintained by the government; and that the wind, which was then blowing straight down the Sound, was from the southeast direction (the course of the shore there is in reality nearly northeast and southwest)—all indicating uncertainty in a matter which, as he himself says, occurred in the dark, and when he could see nothing except his anchor chain, which, of course, led directly into the wind, even if the wind shifted in its direction. Further, his testimony that he did not see the red light at the end of the breakwater, but did see a white light or small lantern placed either upon Rock Island or a stake still further up the bay, would indicate that the place of anchorage was much inside of where he locates it upon the chart. McSpirit, the owner of the dredge, tells about the lights of the tug, which he saw half a mile to a mile out from the dredge. The outer end of the breakwater is exactly one mile from the dredge, and he testifies that the lights of the tug were at a point inside of the breakwater. But he further testified that the tug was some mile and a half away when he heard it whistling. This would make the tug come in over half a mile before it reached the point where he saw its lights; and yet both Hendrickson, the scowman, and the captain of the tug, agree that the whistles were blown at the time of anchoring, the captain of the tug testifying that they were blown as a signal to cast off the lines. McSpirit testifies that the red light was upon the end of the breakwater, and Rinklin, his foreman, testifies that he could not see the boats, but locates (some distance from the outer end of the breakwater, and near a shoal called the "Hen and Chickens," exactly one mile from the dredge) the place

where the scow was when at anchor; he again agreeing with McSpirit that the tug was from 1¼ miles to 1½ miles away at the time of whistling. Rinklin, however, remembers that the wind throughout the entire period was from the direction of Mamaroneck, and from the northeast. The weather was also then clear and fine. The witness Chase testifies that he and another man went out in a rowboat a distance of 1½ miles and found the scow outside of the breakwater, and that he was gone 1¾ hours; while Brown, another witness from the dredge, places the boats at a distance of 2 miles from the dredge, or at least a mile out in the Sound beyond the extreme outer edge of the breakwater. According to the witness Horton, flood tide at this point runs west past the breakwater and does not run up into Larchmont Harbor. He was of the opinion that there was not much difference between slack water and ebb and flood tide in Larchmont Harbor.

According to the chart put in evidence, the average height of high water at New Rochelle, which is not far from the point in question, is 7.6 feet; and it may be remarked in passing that the large expanse of mud flats shown in Larchmont Harbor, under an average depth of 2 and 3 feet at low water, makes it almost impossible to agree with Mr. Horton that there is little flood and ebb tide in and out of Larchmont Harbor. It would seem to be a necessary inference that, if the scow Driscoll reached Larchmont Harbor at high water in the neighborhood of 6 o'clock upon the evening of December 20th, and that the strong wind or storm came in the neighborhood of 11 o'clock, the heavily loaded scow would not have been likely to go adrift from the point where Capt. Howell locates her on the chart in 2 feet of water at low tide. On the other hand, the rising tide from midnight until 6 o'clock the following morning, when the scow landed upon the rocks, must certainly have had a considerable effect upon a deeply loaded scow dragging at an anchor, almost sufficient in weight to hold her against a storm. The engineer of the tug testifies that he saw the red light at the end of the breakwater and that the tug proceeded some 30 minutes after that before dropping the scow. These various inconsistent bits of testimony lead to the conclusion that the tug left New York so as to take advantage of the flood tide to Throgg's Neck, where the tides meet, with the idea that, if that point could be reached at about the turn of the tide, the ebb tide would then be utilized from that point to the Larchmont Breakwater, and subsequently to Mamaroneck, with the load of sewer pipe; that the tide did not turn before the tug reached Larchmont Harbor, and that thereby time was lost, so that in the dark the exact locality of the dredging operations could not be ascertained; that the scow was left at anchor somewhere between a line drawn from Long Beach Point to Umbrella Point and Rock Island, the scow having been left in about 12 feet of water, and the tug drawing at that time 8½ feet; that the tug then left the scow, no sufficient indications of bad weather having been observed, and none of the government bulletins or signals having been encountered or observable during the trip up the East river and through the Sound, inasmuch as these signals were not displayed until after 4 p. m.; that the scow would have been entirely safe, and no harm have come

to her, except for the extraordinary storm which broke in the neighborhood of 11 o'clock that night; and that subsequently to the descent of this hurricane from the northeast the scow drifted, under the combined influence of this wind and of the flood tide, and ultimately struck the rock called "North Ledge," and then drove on the shore.

This leaves the sole remaining question one as to the responsibility of the tug from the standpoint of having started so late that she was unable to do what might have prevented the accident, or from not standing by or returning to the scow after danger developed. The cases of Cokeley v. The Snap (D. C.) 24 Fed. 504, and Philadelphia & R. R. Co. v. New England Transp. Co. (D. C.) 24 Fed. 505, plainly set forth the responsibility under such circumstances, where reasonable care and prudence required the tugboat to stand by a tow at anchor . or to seek refuge from an impending storm; while in the case of Brown v. Cornell Steamboat Co., 121 Fed. 682, 58 C. C. A. 430, no negligence was imputed to a tugboat leaving its tow in a usual and safe place, the danger being caused by a storm of exceptional severity, and under such circumstances that the tugboat could not return, after the breaking of the storm, to render assistance to its tow. The latter case also announces the doctrine that the tugboat is not responsible for the size of the anchor of the scow; but that that is a matter for the scow alone.

It does not seem that negligence can be imputed from any delay in the time of starting in the case at bar. The slight miscalculation as to the duration of the flood tide may have delayed the progress of the boats. But, if the court is correct in its finding as to the facts, this delay did not prevent the tow from being left sufficiently far enough up in Larchmont Harbor to be in a reasonably safe place, and the place of anchorage was in such a location that the captain of the tug cannot be held negligent for anticipating that from the weather conditions then observable the scow might reasonably be expected to safely ride through the night. The case, therefore, seems to fall under the doctrine of Brown v. Cornell Steamboat Co., supra, rather than of Cokeley v. The Snap, supra; and while the peculiar condition of the testimony has made it necessary to go further than to examine the question whether the libelant sustained his burden of proof, and while the court has endeavored to determine what the facts were, in order to find if negligence was shown, yet the decision must be placed upon the ground that the libelant has failed to prove, by a preponderance of credible testimony, that the scow was left at anchor in such a position as to show negligence on the part of the tug in so doing, or that negligence in towing had occurred prior to that time.

The libel will be dismissed.