## McMILLAN v. MORAN.

### (District Court, S. D. New York. March 11, 1901.)

LIABILITY OF TUG—INJURY TO TOW.

Where the masts of a steamer in tow were evidently very high, and the captain of a tug, when twice requested to come up at low tide with the vessel under the Brooklyn Bridge, had refused to do so, but took the vessel under the bridge at the top of the tide, having been informed that the masts were about 134 feet high, and believing the bridge to be 135 feet above mean high water, leaving only about a foot for contingencies, he assumed the risk of the uncertainty as to the exact height of the masts, and that, together with the fact that in warm weather the bridge drops from expansion of the steel cables, and that it varies with the loading, and that if from any cause the course of the vessel is forced to one side or the other from the center of the bridge, the bridge itself at the point of passage is lower, it rendered the owner of the tug liable for the breaking of the masts of the vessel in attempting to tow her under the bridge.

In Admiralty.

Convers & Kirlin, for libelant.
Wing, Putnam & Burlingham, for respondent.

BROWN, District Judge. At about quarter past 3 in the afternoon of August 4, 1900, as the British bark Vimeira, in tow of the respondent's tugs Ivin and Ellis, was passing under the Brooklyn Bridge, her three forward topgallant masts of wood were broken by collision with the bridge, and the jigger topgallant mast of steel was bent back. The above libel was filed to recover for the damage, alleging negligence in towing the vessel under the bridge at high tide, and in not making sufficient allowance for the known height of the masts.

The respondent defends on the ground that the pilot in charge of the towage was assured by the master that the masts were but 133 feet high, and that the bridge had been always understood to be 135 feet above mean high water, whereas the masts were upwards of 135 feet high, and would not have been touched had their height been only 133 feet.

The respondent had contracted to do the local towage of the bark upon this voyage, "from ballast dock to dry dock, to loading berth, and to stream and sea." On August 3d, she was lying at Shooter's Island dry dock, and in the afternoon of that day the respondent was requested to tow her that afternoon to her loading berth at Newtown creek at low tide. This being refused, the request was made that she should be towed at low tide the next forenoon; this also was refused. She was taken in tow at 1 o'clock on August 4th and came up with the flood tide. When near Governor's Island the master of the bark was asked to let the pilot know the height of the masts "as near as he could get at it." The master consulted the plans and reported about 134 feet. This is confirmed by other testimony, and is the height I find given to the pilot.

At the Brooklyn Bridge it was high water that day, according to the testimony of Mr. Spaulding, at 2:48 p. m., and during an interval of about 25 minutes thereafter before the bark reached the bridge there was no material change in the height of the water, which was also very near the height of ordinary mean high water.

For many years it was the general understanding that the center of the bridge was 135 feet above mean high water, and it was so stated on the government charts. Further examination, however, led to a correction of this estimate by the government surveyors, and in January, 1900, the height as stated upon the government charts was changed to 133 feet, "as the actual height is subject to variation according to temperature, load," etc. While knowledge of this change was available to all, little attention seems to have been given to it. Mr. Martin, chief engineer of the bridge, was not aware of it; the respondent's pilots were not aware of the change, and the respondent was not in the habit of furnishing to his captains or pilots any harbor charts, and did not do so.

Three days after the accident, when the draft of the vessel was supposed to continue the same, Mr. Congdon made a measurement of the masts as well as he was able, and reports the foremast 135

feet $4\frac{1}{2}$ inches; while the master, on further examination, adhered to his former report of 134 feet. Mr. Congdon found a mark 1 foot 9 inches below the top of the mast, which he thinks might have been caused by contact with the bridge; if that mark was so caused, the height of the bridge at the place of contact at that time, would have been 133 feet $7\frac{1}{2}$ inches above the water, if Mr. Congdon's measurement was exact, or 132 feet 3 inches if the master was correct. Mr. Congdon's measurement was not made under circumstances or in a manner to afford perfect accuracy, but I do not think any inaccuracy is likely to have been so much as 16 inches, and the true height was probably between the two computations.

Although the bark passed according to the testimony nearly under center of the bridge, there are circumstances making it probable that she was in fact a little to the eastward of the center. The testimony shows that at a point 75 feet to the eastward, the bridge is one foot lower; and from that point to the Brooklyn abutment the bridge drops on an average about 1 foot in 50.

The testimony of the most experienced tug men is that no attempt to take vessels with high masts under the bridge should be made, except allowing from a foot and a half to two feet margin. This seems little enough considering the following five material circumstances:

(a) The uncertainty as to the exact height of masts in the variable loading and trim of the ship; (b) the fact that in warm weather the bridge drops from expansion of the steel cables; (c) that it varies with the loading; (d) that in any pitching of the vessel in uneven water, the masts require a higher space; (e) that if from any cause, whether from miscalculation of the center of the bridge, or if the course of the vessel is forced to one side or the other by other craft, the bridge itself at the point of passage is lower. In the warm weather of August all these causes may be combined.

I think the respondent in this case should be held to blame for the damage for the following reasons: The evidence shows that common practice requires tugs when towing vessels with high masts under the bridge, to avoid going at high water; these masts were evidently very high; when twice requested to go up at low tide, the respondent refused, because he did not wish "to buck the ebb tide"; he had no right to refuse the ordinary prudent course, for his own convenience, except at his peril; he took the bark under the bridge at the top of the tide; the pilot, as he says, believed that the tide had fallen from 15 to 18 inches, and for this miscalculation the defendant is responsible; the pilot was told that the masts were "about 134 feet high"; perfect exactness on this point, as above stated, was neither obtainable nor expected; and allowing at least a foot and a half margin for contingencies, which according to the best experts is as little as prudence would require, the pilot had no right to go on unless he could count on $135\frac{1}{2}$ feet space, which is more than any estimate ever gave above mean high water, while the actual height at the point of contact was somewhere from 132 feet 3 inches to 133 feet $7\frac{1}{2}$ inches; that the pilot was not justified in attempting to pass under the bridge with masts about 134 feet

high, except after a considerable fall below high water; that the attention of the pilot had been called to the fact that the water was high, and that any observation of the piers and slips must have shown the pilot that his alleged supposition that the water had fallen from 15 to 18 inches was mistaken.

While I consider it only a reasonable duty of tug owners to keep their tugs supplied with local charts and to take notice of the government reports and corrections for their information and benefit. and that in this case there was therefore negligence of the respondent in not apprising the tug captains of corrections in the estimated height of the bridge above mean high water, I do not think it necessary to decide the present case on that ground, as the considerations previously expressed are sufficient.

Decree for the libelant with costs.