### THE SOMERS N. SMITH.

### THE CRESCENT.

(District Court, D. Maine. February 3. 1903.)

Nos. 32, 33.

1. TOWAGE—CARE REQUIRED OF TUG—DANGEROUS LOCALITY.

The reasonable care a tug is required to exercise in the performance of a towage service is relative, depending upon the dangers of the service. If the locality is more than ordinarily dangerous, she is held to a proportionately higher degree of care and skill.

2. SAME—STRANDING OF TOW.

Evidence considered, and *held* to show that the stranding of a schooner on a reef while being towed through a narrow and dangerous channel was due to a want of accurate knowledge of the channel on the part of the master of the tug, and to a want of care in failing to ascertain whether a buoy used to mark the position of the ledge on which the schooner stranded was in its proper place.

3. SAME—CONTRACT LIMITING LIABILITY.

The burden rests upon a tug to prove an alleged contract that a vessel was to be towed at the risk of her owners; nor will such contract, if

proved, relieve the tug from liability for the consequences of a failure of those in charge to exercise reasonable care and skill in the performance of the service.

In Admiralty. Suits to recover damages for alleged negligent towing.

Benj. Thompson, for Thos. B. Mehaffey.

Arthur S. Littlefield, for Isaac C. Gay.

HALE, District Judge. These two cases were heard together, and are to be decided upon the same evidence. They make practically but one case.

In the first case, Thomas B. Mehaffey, in behalf of the schooner Crescent, brings this proceeding against the steamtug Somers N. Smith to recover damages alleged to have been sustained by that schooner by the negligence of the said steamtug in towing said schooner upon Gangway Ledge, in the entrance to the harbor of Long Cove, in the town of St. George, December 8, 1901. The schooner Crescent is a three-masted schooner of 463 tons gross tonnage. Her length is 150 feet, and her width 34 feet 8 inches. At the time of the injury she was drawing 12½ feet forward and 14 feet and 1 inch aft, and was loaded with paving blocks, under a charter obtained through J. W. Linnell, of Boston, to the Booth Bros. & Hurricane Island Granite Company. The memorandum of charter shows that she was to load paving at $1 per ton, to be "loaded and discharged, and free wharfage, and towed out of Long Cove free." The steamtug Somers N. Smith is 66 feet long, 16 feet beam, and at the time carried a crew of four men. She had been employed in that vicinity and had towed vessels in Long Cove, for many years. On the morning of the day of the injury the tug was made fast to the Crescent about 8 o'clock by a hawser over each bow of the schooner attached to the stern bitts of the tug, so that the tug was from 25 to 40 feet ahead of the schooner's jib boom; the passage out of the Cove is between Gangway Ledge on the northerly side and State Point Ledge on the southerly side, the passage being about 75 feet wide, and the water in the deepest part being 15 to 16½ feet deep at high water, which was about the time the towage service took place. The schooner, after being in tow about five minutes, and proceeding less than 500 yards, struck and was stranded upon Gangway Ledge, on the northerly side of the channel.

Without now considering the question whether or not the tug is relieved from her ordinary duties and liabilities by reason of a contract of exemption, it is necessary first to decide whether or not the tug was negligent in the management of its tow. This branch of the case may be first examined and decided, as though it were the only question at issue. The place where the towage service was performed demands in the outset careful attention. The channel is narrow and crooked. A short distance from where the tug was made fast to the tow the channel is reached at what is called the "Deep Hole," just below Ringbolt Ledge, and from this point the course is straight out through a passage between Gangway Ledge and State Point Ledge. This passage is found by certain range marks on the mainland, about which there is some conflicting testimony. The answer describes the

channel as narrow and crooked. Mr. Gay, the agent of the steamtug, says, "The place is a very critical, bad place; and is not a navigable place hardly." The pilot, who had been engaged in piloting service at this place for 15 years, and had taken out 40 or 50 vessels a year, says, "You cannot get but very little out of the channel, one way or the other, between Gangway Ledge and State Point, without going ashore with a deep-draught vessel;" that you have to keep very close to the channel, and that a matter of 10 feet one way or the other will take you ashore. Mr. Smith, the superintendent of the granite company, to which the schooner was chartered, was very familiar with the place, and says he had been in and out a thousand times, and that a schooner would have to be kept in the channel, and, if she deviated from a straight course, she would get into the mud on either side of the channel; she could deviate but a very few feet; that vessels going out take a sheer when they reach shoal water, and a tug almost invariably has to change her course to meet the sheer. He says that on the morning of the accident he was watching the schooner, as he always feels nervous until a vessel passes out, and more at that time than usual, as the Crescent was a very deep-draught vessel. All the witnesses who know anything about it recognize the fact that the passage is dangerous, that the water in the deepest place is not more than 15 or 16 feet deep at high tide, and that vessels can pass out in safety only by the most vigilant precautions. There is testimony, further, that the spruce buoy upon Gangway Ledge was liable to be misplaced, and there is some testimony that it actually was out of place on the morning of the injury. Such misplacement or liability to misplacement adds to the hazards of towing in this place. The preponderance of evidence shows that the water in the deepest place between Gangway Ledge and State Point Ledge was in the center of the channel, not nearer to Gangway Ledge than about 25 feet, and that, unless a vessel was kept in this channel, she would take the bottom, even at high tide.

Now, it is well settled that a tug is held to reasonable care in the conduct of her towage service, but that such reasonable care is measured by the dangers which she is encountering. Judge Fox said in The Adelia, 1 Hask. 505, Fed. Cas. No. 79:

"The tug is only chargeable with reasonable, proper skill and care; but in the opinion of the court these are relative terms, and must be understood to be such as are reasonable and proper, and demanded by the peculiar circumstances and emergencies of the case."

He quotes the leading authorities of The Webb, 14 Wall. 414, 20 L. Ed. 774, and The Syracuse, 12 Wall. 171, 20 L. Ed. 382. In the case from which quotation has just been made, Judge Fox, in discussing the evidence, says:

"The master of the tug well knew the dangers which attended this locality, which were neither few nor small. He knew that the current there was more violent than at the anchorage; that the width of the river for his movements did not exceed three hundred feet; that the current set strongly to the easterly shore, as well as downward; that the shoal, with the rock thereon, projected nearly half the width of the river, and into the current; and that, if the tow should become unmanageable, and escape the control of the tug, she must be taken down broadside by the current, and thrown upon the shoal and rock."

He further says:

"Knowing, as the master must, all these dangers,—and if he did not know them then he was not qualified for his position,—and having, without consultation with the master of the schooner, chosen to make the attempt to wind her in that locality, in the opinion of the court a much higher degree of care, skill, and attention is demanded of him than if he had undertaken the same movement under circumstances free from danger. If the place selected had been deep, broad, open, still water, free from rocks and shoals, it is clear that the master would not have been expected to exercise the same carefulness and attention and good judgment as to the speed and management of his tug and in holding the tow always under instant control as he would when there was great and immediate danger with strong forces to contend with, which, if not properly met, involved the destruction of the property under his charge."

In the case of The Julia S. Bailey, a case involving towage service over Sullivan Falls, a dangerous locality, Judge Webb, in an unreported opinion, says:

"The slightest departure from the highest skill and care is almost certain to be attended with loss; and, although the mere fact of trouble raises no presumption of fault, it does call for the sharpest scrutiny of all attending circumstances."

In the case of The Webb, 14 Wall. 406, 20 L. Ed. 774, cited by Judge Fox in The Adelia, supra, Mr. Justice Strong said:

"The contract requires no more than that he who undertakes a tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services. * * * The place where the injury occurred would be considered in connection with the injury itself."

In the case of The Deer, 4 Ben. 352, Fed. Cas. No. 3,737, Mr. Justice Blatchford said:

"The fact that the sunken pier was there was known to her [the tug], and yet she ran the barge upon it. * * * The fact that the existence of the sunken pier was known to those navigating the steamboat makes the running of the barge upon it conclusive evidence of negligence under the circumstances, in the absence of proof of any vis major."

In the case of The Hercules (D. C.) 81 Fed. 218, it was held:

"The master of a tug plying in a busy harbor is not justified in relying absolutely upon the presumption that a buoy placed by the government to indicate a dangerous obstruction to navigation in such harbor is in its proper position, but is bound, especially when towing a large ship past the obstruction, to observe the bearing of such buoy and watch for any change in its position."

The court further says:

"Certainly, there is no more important duty devolving upon the captain of a tug than to ascertain the location of an obstruction he has to move around with a large ship."

Did the tug meet the requirements imposed by law upon a steamer doing towage service in so dangerous a location? The account which the master of the schooner gives is that the vessel proceeded from the wharf a short distance before she came to the range, which he says is marked by a tree and hoister on the mainland to the westerly and by certain objects on Clark's Island at the easterly end of the channel, these monuments being in range line. He says that when the tug

boat came alongside that morning Capt. Holmes was in command and in the pilot house; and that he (Capt. Mehaffey) had seven men,—himself, the mate; steward, and four sailors; that Warren Allen, the local pilot, but not in the employment of the schooner, was aboard the tug with two of his sons; that the tug came along, backed under the schooner's bow, and made fast to the tow with two hawsers; that the schooner had nothing to do with determining the length of the hawsers, but that this was determined by the mate of the tug; after the hawsers were made fast, the towboat started; soon after starting, when they got abreast of Ringbolt Ledge, and before getting to the rangeway, the tug turned to go down the channel at a point 50 or 60 feet to the northward of the center of the range line; that he saw the tug was swinging before he got into the range; that he spoke to the pilot, who said, "Holler at him, holler at him!" that he then shouted, and waved his hand, to sheer over into the channel, but there was not a soul on the towboat to be seen, and nobody on the stern, and that by the time he ran to the rail by the fore rigging the tug had passed the buoy on Gangway Ledge so close that he could have stood on the towboat's rail and put his hand upon it; that he saw Peter Richardson come out of the engine room or the fire room, and run forward, to notify them in the pilot house, but that before he (the captain) could get to the topgallant forecastle of the schooner she struck the ledge. He said that when he found the tugboat was not in the channel, he put his vessel as far as he could to the southward of the towboat by putting his wheel hard aport, and that he remained in this position, in order to keep as near the channel as possible, until the vessel struck the ledge. He says that the towboat, as she approached the ledge, was never in position with the rangeway marks; that, as she went towards the ledge, she kept close to the buoy. Capt. Holmes, the master of the tug, gives an account of the starting of the vessels somewhat similar to that given by Capt. Mehaffey, the master of the schooner. He says he had heard from the pilots about the marks and the ranges in going out of the channel, but he gives a statement of the ranges somewhat different from Capt. Mehaffey's. He makes the spruce buoy on Gangway Ledge one of the marks that constitute the range. His account of the turning into the channel is different from Capt. Mehaffey's. He gives his custom to swing in the Deep Hole, and there get into the rangeway, and indicates in his testimony that he did this on the morning of the injury. He says he has always been told that the best water in the channel is close to the buoy, and adds: "It is all the way I know. I never saw it but once at low water." It further appears that only two of the crew of the tug observed the range marks, and that these two relied upon the buoy and the marks on Clark's Island. There is some contradictory testimony upon the question as to when the schooner began to sheer. Without discussing this testimony in detail, the court, from the preponderance of testimony, is of the opinion that there was no sheer on the part of the schooner which in any way led to the disaster; that the sheer which took place was after the schooner had taken bottom near the ledge and straightened up on the towline,

thus swinging to port. Certain marks found in the mud at low water after the stranding of the vessel tend to this conclusion. The position of those marks shows that the vessel was heading in a straight line for the buoy on the ledge. It is to be observed that the buoy was under the main rigging on the port side when the schooner finally brought up. If there had been so pronounced a sheer as has been claimed, the conclusion is almost irresistible that her bow only would have been on the ledge. These marks in the mud, and the preponderance of other evidence, tend to convince the court that the testimony of Capt. Mehaffey is correct,—that just before the vessel struck she sheered when the buoy was just outside of her cathead; she straightened up after the tug, the tug having been on her port bow. The testimony as to the examination of the mud marks is material, too, in deciding whether the towboat followed the channel or kept too near the northerly side. Mr. Smith, the agent of the granite company, gives his opinion that the deepest water was not on the Gangway Ledge side of the channel. He says he went to the vessel at low water the day of the injury, and saw the marks of the vessel's keel in the mud, and he should say the marks were not in the channel at all; but that the vessel would have gone all right in the channel. Capt. Mehaffey, too, saw the vessel's keel marks, and says that the vessel's heel took the bottom and straightened up somewhat after the tug, and that she had been dragging on the bottom the length of the courtroom; that the keel marks showed at low water after the vessel went ashore, and showed that the schooner was way out of the channel, away to the northern side of the channel. He says the keel marks dragged in the mud 50 feet; that in the place where marks of the keel were in the mud the water was 3 or 4 feet shoaler than it was to starboard; that he could see the direction the schooner took for the ledge by these marks, and the water was at least 3 or 4 feet deeper 35 or 40 feet away; that he could see these lines in the mud two-thirds the length of the vessel; that there was a straight line from the point where the keel mark began to the place where the schooner struck the ledge. This testimony as to the keel marks in the mud does not appear to have been contradicted, and is, in the opinion of the court, very valuable testimony on the question whether the vessel was kept in the channel, and also on the question as to when the sheer began.

The libelant contends that the lack of a competent lookout on the after-deck of the tug was a cause of the stranding. The court is not satisfied by a preponderance of testimony upon this point. While it is of the opinion that there was not an adequate lookout, it is not satisfied that the omission to have such lookout contributed to the stranding. It must be borne in mind that the whole towage incident took only about five minutes. It seems clear that, even if Richardson, the mate of the tug, had been where he could at once notify the captain at the wheel that the tug was not in the deepest water as she approached Gangway Ledge, that she was out of position with reference to the rangeway, and that the schooner was not in the channel, there would then have been too little time to have changed the course of the tug and avoided the stranding. The court is of the

opinion, from the preponderance of evidence, that the preponderance cause of the stranding of the schooner was that the master of the tug, although he had had many years' experience in towing vessels at this point, did not know the channel; that he took the testimony of certain pilots as to where the location of the deepest water was; that he turned into the channel too early, and several feet too far to the northward; that he did this either without knowledge of the range marks, or without paying suitable attention to them, thinking that the deepest water was next to Gangway Ledge, whereas the preponderance of evidence clearly shows that the deepest water was near the center of the channel; that the tugboat did not follow the usual marks which pilots of experience had been accustomed to follow in going in and out, but attempted to go down on the northerly side of the channel in shoal water, under the mistaken impression that the deep water was at that point, giving the buoy only a small margin; and the result of the stranding shows that the schooner was approaching in such a way that she brushed the buoy, the buoy being found under her bilge after the tide had ebbed. It was the duty of the master further to know, with reference to the location of the buoy on Gangway Ledge, whether or not it was out of position at the time of the towage service. It is unnecessary to find whether or not the buoy was actually misplaced on that morning, but clearly it was the duty of the captain to be informed upon this fact before assuming the hazards of towing a large vessel down through this dangerous passage. In these respects the court finds that there was a want of care on the part of the tug, her captain and crew, proportionate to the dangers to which the schooner was subjected. The court therefore finds negligence on the part of the tug, her captain and crew.

Another very important question now arises upon the pleadings and upon the testimony. It is contended by the claimant that the steamtug is relieved of its ordinary obligations to the schooner by a verbal contract between the towboat and the charterers under the terms of which the granite company or the vessel was to furnish a pilot for the tug, and the owners of the tug were to furnish simply the motive power to propel the tow, and to be in no way responsible for her navigation. The claimant therefore contends that the schooner, under this verbal contract, was towed entirely at the risk of the owners. The burden of proving a contract that the vessel was to be towed at the risk of its owners is upon the towboat asserting such contract. See The James Jackson (D. C.) 9 Fed. 614. Without discussing the conflicting testimony on this point of the case, it is, in the opinion of the court, at least doubtful whether the claimant has overcome this burden by a preponderance of evidence. The charter assumed that the towage out of Long Cove was to be free. The concurrent action of all parties seems to the court not to be consistent with the fact that there existed a contract of exemption by which the towboat was relieved from all responsibility. The contract was a verbal one, and there seems to have been some misunderstanding on the part of some witnesses as to exactly what was meant by the furnishing of motive power, and as to precisely what the terms and

effect of the alleged contract were. In the opinion of the court, even if the contract claimed by the owners of the tug had been established, it would not relieve the tug nor her owners from the negligence of the tug or her crew.

In the case of The Syracuse, 12 Wall. 167, 20 L. Ed. 382, Mr. Justice Davis says:

"It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that by special agreement the canal boat was being towed at her own risk, nevertheless the steamer is liable if, through the negligence of those in charge of her, the canal boat has suffered loss. Although the policy of the law has not imposed upon the towboat the obligation resting upon a common carrier, it does require upon the part of the persons engaged in her management the exercise of reasonable care, caution, and maritime skill; and, if these are neglected, and disaster occurs, the towing boat must be visited with the consequences."

In the case of The M. J. Cummings (D. C.) 18 Fed. 178, it was held:

"The duty of a towboat, in respect to the vessel in tow, not to cause injury to the same, does not arise out of the towage contract, but is imposed by law; and an agreement that a boat shall be towed at her own risk will not exempt the towboat from liability for damages caused by her own negligence."

In the case of The Jonty Jenks (D. C.) 54 Fed. 1021, the court holds that "a stipulation in a towage contract that the tow shall assume all the responsibility does not relieve the tug from liability for damages caused by want of reasonable care and skill in navigation." The court (Judge Coxe) said:

"It is unnecessary to determine whether or not the towage service was undertaken upon the express agreement that the owner of the canal boat should assume the entire responsibility, for such an agreement, if made, would not exempt the tug from proper and reasonable skill and care in her navigation."

In the case at bar the court is of the opinion that the master and crew of the towboat were not in the exercise of reasonable care, caution, and maritime skill in the conduct of the towage service, and it follows, as a matter of law, that, notwithstanding the alleged contract, the towboat must be held in fault. The libelant is therefore entitled to hold the tug accountable for the damages sustained.

Decree for libelant. Fritz H. Jordan appointed assessor.

In the second case, namely, Gay et al. v. The Crescent, the claim is for services in the nature of salvage in providing a lighter which assisted in unloading the Crescent and in pulling her off the ledge and towing her to a place of safety. As the court has held that the stranding of the schooner was caused by the fault of the tugboat, her captain and crew, the rescuing her from the dangerous position in which she was so wrongfully placed cannot be rewarded by any allowance in the nature of salvage, or by any allowance such as claimed in the case at bar. In this respect the case is like that of The Julia S. Bailey, cited in this opinion. In the case at bar, therefore, the decree must be: Libel dismissed, with costs.