## THE CASPIAN. THE ADRIATIC. MARTIN et al. v. PAN–AMERICAN PETROLEUM & TRANSPORT CO. et al.

(District Court E. D. Pennsylvania. August 26, 1925.)

**1. Towage** ⬤═3—**Contract to dock steamship held not limited to actual berthing but to begin when she was ready to go into dock.**

A contract for use of tugs to dock steamship, construed in view of custom and practice, *held* to make the service begin when she was ready to be taken into the dock and not confined to her actual berthing, though she was moved under her own power.

**2. Towage** ⬤═15(2).

A tank steamer *held*, on the evidence, to have been stranded while respondent tugs were docking her.

**3. Towage** ⬤═11(1)—**Tug master, in taking charge of a steamship for docking, held acting as employee and representative of the tug owner.**

A contract for tugs to dock a steamship *held* to require them to meet her when off the pier and take full charge of her for docking purposes, and the master of one of the tugs in going on board her to take charge of her movements as customary was the employee and representative of the tug owner, though, as latterly the custom, he was given a small gratuity by the steamship.

**4. Towage** ⬤═11(5)—**Tugs employed to dock a steamship held not chargeable with negligence causing her stranding.**

Respondents, employed to dock a tank steamer with their tugs, *held* not chargeable

with negligence which rendered them liable for her stranding.

**5. Towage ⊙═▷15(2)—Burden of proof considered in suit for damage to tow from grounding.**

If the navigator of a tug takes a tow into a place where there are dangerous obstructions, the existence of which he is bound to know, and the tow is injured by stranding, to clear himself from liability the burden rests upon him to show what the obstruction was that caused the damage, and that it was not one of which he was chargeable with knowledge, but, if the place was one where there was no known obstruction, the ordinary rule governs that one who alleges negligence must prove it.

Decree affirmed in 14 F.(2d) 1013.

Howard M. Long, of Philadelphia, Pa., and Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for libelant.

H. Alan Dawson and Biddle, Paul, Dawson & Yocum, all of Philadelphia, Pa., for respondents.

DICKINSON, District Judge. This cause was heard by our lamented brother, McKeehan, J., but its decision was interrupted by his death. The parties have agreed that it be argued and determined as if the whole trial had been conducted by us.

#### The Pre-Lis Fact Situation.

The libelant is the tanker Kellogg. She was loaded with crude oil consigned to the Texas Oil Company plant, located on the west shore of the Delaware river just south of Marcus Hook, Pa. This called for her to be berthed alongside of a pier extending into the river. The respondent was employed to dock her. In the operation the tanker grounded and is averred to have been damaged. Out of this general fact situation grew the lis in this case.

#### The Pleadings.

The libel filed is one against the managing owner of the tugs in personam and against the tugs in rem. The pertinent averments made are the employment of respondents to dock the tanker and of their obligation to do so without injury to the vessel; the participation of the tugs in the operation; the going of the master of the tug Caspian on the bridge of the tanker to direct her movements and the libelant's version of the steamer being run upon a rock and consequent damage to her. The resultant damages are ascribed to the respondents' negligence in the following particulars:

(1) Incompetency of those in charge of the tugs.

(2) Permitting the tanker to fetch up on a rock, the danger of which the respondents knew or should have known.

(3) Failure to have due regard to the influence of the tide upon the course of the movement of the tanker.

Damages in the sum of $200,000 are claimed.

The answer is, in substance, that the employment of respondents was limited to the use of the tugs in putting the tanker in her berth after she had come to the dock; that she attempted to get to the dock under her own power and in her own way, with which neither the respondents nor the tugs had anything to do except that the tug Caspian aided the tanker in heading toward the pier by pushing the bow of the steamer around, which assistance had been ended before the stranding and in no way contributed to it; in order to get to the pier so that the tugs could dock her, the tanker employed the services of one John S. Bishop to direct her movements; Bishop is averred to have been an independent contractor employed and paid by the tanker and who was not pro illa vice in the employment of the respondents, although he is admitted to have been incidentally at that time master of the tug Caspian; the negligence of respondents and their responsibility for the stranding is denied, the grounding of the tanker being ascribed to its own negligence, in that its officers gave to Bishop an understatement of its draught and failed to apprise him of the shoal, the existence of which they knew but he did not; the damage of the steamer in a previous mishap which made her unmanageable in handling, a fact of which Bishop was not informed; and a denial of the stranding upon rocks and the averment that the tanker rested easily upon a sand bar from which she was raised by the next flood tide without any damage to ship or cargo. The participation of the tugs is likewise denied or that they had any relations with the tanker except that they were under contract to render services upon which they had not as yet entered when the stranding took place. Damage as averred in the libel is denied, and the damage done by the

stranding, if any, is asserted to have been negligible.

### The Fact Issues.

Several issues of fact and law were raised which are disclosed by the following questions:

(1) Had the respondents entered upon the performance of their contract at the time of the mishap to the tanker?

(2) Was Bishop, when in control of the movements of the tanker, acting for the respondents, acting for himself as an independent contractor, or was he acting for the libelant?

(3) Was the negligence of the respondents the proximate contributing cause of the stranding?

(4) Did the tugs or either of them participate in the handling of the tanker or was the stranding before either of them entered upon the performance of the service of their employment?

(5) Was the bottom upon which the tanker rested rock or sand, and did the tanker suffer any damage therefrom?

In the view we have taken, some of these questions need not be answered.

### Fact Discussion.

We have had the benefit of a memorandum made by Judge McKeehan, of which, by stipulation of counsel, we were to make use. It consists of a summary without comment of the testimony and evidence. We have treated it as if taken by ourselves. Before formulating the ultimate fact findings made, there are a few evidentiary facts which should be first found. It is perhaps proper to state that the findings reached are doubtless, to some extent, influenced by a personal knowledge of the local waters. We shall, however, make our findings from the evidence. Viewing the stranding of the tanker as an effect, there was a chain of causes (as there always is) leading up to it. Chronologically, the first is the time at which the attempt was made to dock the vessel. It had been planned to have her docked at slack high water. Had the docking been then attempted, it would have been accomplished without mishap. As it was, the attempt was made at almost dead low water. The bottom below or south of the pier is what on land would be called strewn with boulders. Naaman's creek, which empties into the Delaware not far from the pier, would doubtless suggest the theory which would account for the presence of the boulders. They would be expected to be spread out over a considerable area and would be found clustered more closely near its center, with scattered and more or less isolated boulders on the outskirts. This would lead to the expectation that there would be more of them in numbers as you approached the creek, but that some would be found at some distance from what might be called the nest. Sand bars would likewise be expected to have formed on the creek side of the pier.

This brings us to the first fact finding to be made, which is the direction of the approach of the tanker to the pier and the spot on which she brought up. Our finding, broadly stated, is that she was brought in from abreast of the pier and that no part of her was at any time much, if any, below the extension of its south line into the river.

The testimony and other evidence of just where and upon what the tanker stranded has not been made as clear as it might have been nor, from the viewpoint of the convenience of the trier of fact, as it should have been, but, inasmuch as she fetched up and as soundings made all around her showed plenty of water and a clear bottom, the fair inference is that she fetched up on what we have described as an isolated boulder. The presence of sand bars and rocks to the south of the pier was before this stranding the common knowledge of all watermen familiar with the Delaware river, but the accepted fact was that there were no sand bars or rocks as far north as the south line of the pier, or near it. Inasmuch, however, as the attempt to dock the tanker was made at dead low water, a proper precaution to have taken was to make sure of sufficient depth to float her, the margin of safety being known to be small, even if the bottom had been clear of obstructions, or otherwise to have awaited the rise of the tide. More will be said of this later.

Following the issues sought to be raised by the libel and answer, we acquit the handlers of the tanker and of the tugs of the charge of incompetency. We find them to have been experienced and capable, and to have displayed due skillfulness and employed accepted methods in maneuvering the tanker, and to have exercised due care except in the particular reserved for later discussion, the finding of which we for the present withhold.

[1] We decline to find that the employment to dock was exclusive of everything other than the actual berthing of the tanker,

There is an indefiniteness in the terms of the contract or a dearth of evidence of what the terms were without information of what was usual, but the custom and practice makes the contract begin when the vessel is ready to be taken into the dock, and includes the taking of her in, notwithstanding the fact that she is moved by power supplied by herself.

[2, 3] We find the tanker to have been stranded during the work of docking her, which the respondents had been employed to do. We further refuse to find that Bishop was an independent contractor or an employee of the libelant. The test of employment is selection and control. This was in respondents. Payment of compensation is evidence of employment, which, in turn, implies selection and control, but at the most it is evidence only. Here the $5 paid we find to have been a mere gratuity, which is customarily expected of a vessel to be paid to the employee of a tug who boards and handles the vessel to be docked. Bishop, in what he did, was the employee of the respondents, and was acting for them in what he did. We make this as a preliminary fact finding and conclusion of law, based upon the contract, but not upon a custom. The evidence shows the custom to have been wholly lacking in at least one of the essential elements of a good custom. The parties, however, contracted in full view of it and incorporated it in their bargain. The contract in its express terms was nothing more than a notification to respondent to be on the lookout for the tanker. This meant, however, in view of the common practice, that they should meet her when she arrived off the pier and take full charge of her for docking purposes and docking her meant that they would furnish the tug assistance required and would supply a man to board the vessel and take full charge of her movements as soon as she was surrendered by the pilot who had brought her into port. The man who did this (usually the master of one of the assisting tugs) thereafter directed the movement of the vessel and the tugs. Formerly he received no compensation other than his wages as master of the tug. Latterly it seems the Association of Tug Masters determined that masters should not render such services unless paid extra for it. The tug owners, as was to be expected, opposed the innovation. The dispute was ended very much after the fashion in which coal miners' disputes over wages end. The extra compensation was allowed, to be paid, however, by the consumer, who,

in this case, was the vessel. Since then the compensation has been paid by way of an honorarium, tip, or gratuity. The tug masters of Philadelphia and New York cling tenaciously each to the claim of having first introduced the practice. We need not pause to decide this dispute. The master of the tug remained in the employ of the respondents while performing pilot service for the vessel. The latter had no voice in his selection or conduct. We refuse to find that Bishop was misled by any misstatement of the tanker's draft. We further refuse to find that the master of the tanker neglected to give information of the existence of the obstruction on which the tanker stuck or to find that he had previous knowledge of its existence.

A few general observations may be of aid in interpreting the testimony or explaining why it carries no information to the mind. Much of it relates to former conditions or to traditions among men who follow the water, which had come down from former times. What may be called the natural channel of the river, as you follow it up stream, hugged more and more closely the western shore until you reached Marcus Hook where it was very close in. To the eastward was Hook Bar, which separated what were then the westward and eastward channels. This bar was exposed at low water. Deep draft vessels opened the range lights to avoid Schooner Ledge. By blasting out some of the rock of Schooner Ledge and by guiding and controlling the wash of the current of the river through the construction of jetties and by dredging, a deep ship's channel has been made, within the limits of which vessels could keep at all times by holding the range lights. One effect of this has been to shoal the water near the west shore and to deepen it to the eastward so that there is much less water inshore than there formerly was, and Hook Bar, which in the old days was often bare, has now always several feet of water over it. It is this which some of the witnesses had in mind. The character of the land south of the Texas plant, through which Naaman's creek runs, and the bed of that stream suggest what would be expected to be the bed of the river below this pier. Whatever rock there is in the ordinary sense of that word would be bed rock and well down below the surface of the stream. More or less scattered rock of all sizes (with sand bars) would be expected to be spread over the bottom of the river for some distance on either side of the creek. Above

this the water was deep and the bottom clear up as far as Hook creek. This, under the evidence, were the conditions as known to watermen familiar with the river. Some distance below or south of the Texas pier shoals and rock obstructions, above or on the up-stream side, good water and a clear bottom. Hence it is that talk of rocks or shoals as far up the river as the pier is met with expressions of incredulity, but all admit the presence of shoals and rock obstructions, below some distance to the south. This would, except for other facts, have some bearing upon where the ship was when she struck bottom, because the fact that she grounded and stuck fast until she was floated off by the rising tide, is undoubted. We have, however, the presence of other facts which are likewise beyond question.

This paves the way for another observation. Those who are familiar with conditions on the water, know that it is very difficult to judge distances with any accuracy and likewise to tell when two objects are in line unless bearings are taken. The testimony of witnesses, who have never followed the water and who have taken but casual notice of a vessel or other object some distance out in a stream, but who undertake to speak of its position or distance from shore, is very unreliable, however intelligent and trustworthy they may otherwise be. Several such witnesses have attempted to describe the position of this tanker before and after she was fast on the bottom. None of them sighted her position by bearings, but testified only to impressions received from a more or less casual look. Her position has been described with respect to her being abreast of or above the north line or below the south line of the pier. The tanker had a length of between 400 and 500 feet. The pier, although long, was narrow, in part only 25 feet wide. On the pier head was a warehouse, so its width must have been greater, but just what the up and down river width of the pier head was, the evidence does not clearly disclose. The approximated distance of the known rocky bed of the river is given as 500 or 600 feet south of the south line of the pier. The tanker, when the pilot turned her over to the tug master, was headed up stream, or, in other words, at right angles to the pier. Of what help to us is the testimony of a casual observer that she was about abreast of the pier? If one had sighted along the south line of the pier and had struck the stem head of the steamer, she would have been to the casual observer about abreast of the pier, and yet her stern would have been in dangerous proximity to being opposite the rocky bottom. In like manner, if she had been sighted along the north line of the pier and the sight had struck her stern, her bow would have been well up toward the chemical plant to which some of the witnesses testified. Fortunately there is little if any conflict in the testimony of the master of the Kellogg and that of the master of the Caspian as to her position when the latter went on board, and the conditions under which the Kellogg was handled until she stuck are not in dispute.

At first, vessels were taken into the dock at all stages of the tide and water. The pier is an open one, the tide running under it. It can be readily understood why the docking was restricted to slack water times and ordinarily to high-water slack. In the latter case, the vessel would be taken up stream and turned around so as to approach the pier against the tide, and would be tied up at the end of the pier and warped into the dock at slack water and the young ebb. Skilled men would have had no great difficulty in doing this. Had the Kellogg arrived on schedule time, this would have been done. As it was, she arrived on the latter part of the ebb tide. The consignees were waiting to unload her. Bishop testifies, and in this his recollection is supported by that of the master of the tanker, that she had more speed on than he wanted and he gave time for the tide to snub her headway. This ran her somewhat further up stream than suited his purpose, but yet not too far to work out his plan. This was to turn her nose to the westward which put her partly athwart the ebb tide. The effect was, if she was held in that position, to force her in toward the pier. When she was near enough, the Adriatic, which was kept on the tanker's port side, could, by pushing and the Caspian by a back pull from the starboard side, answer to the lack of steerage way on the tanker and turn her head back up stream again so that she could make fast at the end of the pier and await slack water to be warped into her berth alongside the pier. The tide in the channel where the tanker was is still running down for an hour or more after it has begun to make water along shore, but, as she would not be warped into the dock until low-water slack, and as this pier extends nearly 1,000 feet out into the river, it was to be expected that the tide would be still ebbing when the pier was reached. The

propriety of doing what was attempted to be done is not denied.

After the tanker's bow had been turned to port and she was to be kept steadied as she was, it was observed that her bow was turning rapidly down stream in spite of the influence of a ported helm and the efforts on both tugs to stop the swing. The cause of this was that she was fast aground at the stern and afloat forward. This movement continued until she was practically at right angles to the channel. In this position, it was easier to locate her with respect to being in line with the pier, and she is located as about abreast of it, some placing her as nearly in line with the south side of the pier and others the north side. As no one testified to sighting her position and as the beam of the tanker was nearly as great as the width of the pier, no one could be more definite. We have already laid ground for the ultimate fact findings to be made, but another general observation may not be out of place.

The damage claim here is a large and may be fairly characterized as a stale one. Stale claims are not favored by the law. The reason is a practical one, and well illustrated by the evidence in this case. There is nothing to indicate that any one at the time thought of the vessel having suffered any subsantial damage. It is true that she was aground and the waterman's adage is that "it never does a vessel no good to get aground." The comment of counsel for libelant that it is fair to assume that the stranding did *some* damage (and he underscores the *some*) is a justified one. We would not accuse the learned proctor of perpetrating a pun, but if the damage done reached anything near the sum of $200,000, which is now claimed, it is difficult to understand why enough of it was not apparent to call for comment at the time or at least shortly thereafter. A consequence which concerns us, however, and which has caused the repugnance of the law to which we have adverted, is that we are not only asked to find facts upon the testimony of witnesses taken five or six years after the occurrence which they are asked to recall, but also the testimony of witnesses, none of whom at the time thought their recollection to be of any value to any one. Had these witnesses, when the facts were fresh in their minds, understood that the facts meant $200,000 to one party or the other, we would doubtless have had clearer statements from all of them. The very able proctors for libelant commented with characteristic force upon the failure of the tugboat men to gratify the feeling of curiosity which they might be supposed to have by finding out what it was upon which the tanker grounded. This comment excites two others. One is that their curiosity would doubtless have been stimulated if they had been told that this unknown rock had a value to some one and possibly to them of $200,000. The other is that the very capable counsel for libelant seem to concede that the turning point of the cause is the finding of what it was and the where it was of that upon which the tanker grounded. In other words, his fact theory is that the tanker was negligently permitted to drift down upon the rocks which the tug master was bound to know were existing obstructions because known to every one whose business it was to know of them, and of which in fact he did know. This further means that the tanker when she stuck, was far enough below the pier to be in the region of known obstructions. The fact of where she struck was one easily capable of clear proof if pains had been taken to supply it. We are not unmindful, in saying this, of the point made by counsel respecting the burden of proof. This will be considered in connection with the law of the case.

### The Law.

In addition to the fact findings already made, we have formulated the ultimate fact findings reached as well as the conclusions of law which bear upon the issues presented. This proceeding is a medley of two causes of action against individuals and the tugs Caspian and Adriatic. One cause of action has its basis in a contract and the other in a tort, and one claim is in personam and the other in rem. If it is allowable in admiralty (which is not disputed by respondents) to thus blend these several claims by joining two causes of action and the several defendants, it is because there is such a thing as a contractual responsibility sounding in tort or that for a tort sounding in assumpsit. In such cases the complainant may seek redress either by an action in assumpsit or by one in tort. The joinder of respondents in personam and in rem is likewise allowable because the genius of the law maritime personified a vessel making of her a sensate personality with duties and obligations and rights such as are imposed upon and belong to natural persons, and these tug respondents are joint tort-feasors with the other respondents, in that the tugs were guilty of negligence

which contributed to the damage which the libelant sustained.

[4] The position of the libelant is that the respondents in personam assumed the obligation and duty to perform the service of docking the Kellogg without damage due to their negligence, and, if they were guilty of negligence in which the tugs participated in such way as to contribute to the damage done, all are liable in solido. The crux of the case in the first instance, then, is the negligence of the respondents, and the basis of the averment of negligence is that, knowing of the existence of rock, they took the tanker upon one or negligently permitted her to drift upon it. The evidence is, and the finding is made, that there were known rock obstructions some 500 or 600 feet south of the south line of the pier. These should have been known to the respondents and were in fact known to them. If, therefore, the Kellogg struck one of these rocks, a case of negligence would have been made out. Our finding, however, is that the tanker was at all times kept away from and north of these known obstructions. The tanker was, however, being handled at low water, and was proposed to be taken to the pier practically at dead low water. This required of the respondents the responsibility of awaiting high water before attempting to dock her or to take due and proper care to ascertain that there was water enough to float her when the ebb tide was nearly out. This called for the making of soundings. Our finding is that these soundings were made in the proper way by the use of a lead line, and that, notwithstanding the exercise of due care, no obstacle was found but that, on the contrary, sufficient depth of water was found and that good judgment indicated no obstructions were to be expected to be encountered. The chart markings of 24 feet at certain places are of no pertinent significance. It is well known that under certain conditions the water in the Delaware shallows quite a little. This is notably the case at a low water following a northwester. This, as the expression is, blows the water out of the river. In consequence, the charter soundings allow for this and give safe figures. This is known to all familiar with the river. The fact is confirmed by the soundings made after the tanker grounded that she was not where the argument for libelant places her, and that the obstruction which held her covered a very small area, for there was sufficient water all around her to float her except in the one spot on which her stern rested. This is further shown by the fact that she floated as soon as the water began to rise at the turn of the tide. What it was on which she rested, we can only surmise, beyond the fact that she struck bottom.

[5] The argument is addressed to us, based upon cited cases, that the burden is upon the respondent to show upon what the tanker grounded in order that it may clearly appear that the obstruction was unknown and the existence of which the respondent was not bound to know. There are fact situations which impose this burden. The principle, however, is akin to the res ipsa loquitur doctrine. If a navigator takes a vessel into a place where dangerous obstructions exist, if he sets up as a defense that the obstruction which did the damage was not one, the existence of which he was bound to know, the burden is, of course, upon him to show what the obstruction was, otherwise the inference is a fair one that what had happened was what it was to be expected would happen. The application of this doctrine would be to find that which we have declined to find, that the tanker was taken or permitted to drift into a danger zone. Ordinarily, he who avers negligence must prove it. The fact that the tanker brought up compels the inference that there was something on the bottom on which she brought up, but whether the respondents were guilty of negligence turns here, as counsel for libelant in effect admit, upon the fact of where she grounded, and this fact is found against the libelant.

The other question of whether the tugs can be held answerable through a proceeding in rem need not, in view of the findings made, be discussed. We see in conclusion no substantial distinction between the case of taking a vessel into a dock and that of taking her into a harbor. If there is a prescribed channel known to be safe, a charge of negligence must mean that the navigator has gone outside the limits of the channel and this is a fair inference. When this is shown, the charge of negligence is made out without proof of what it was which was struck. Departure from the prescribed way, with damage resulting, would make out a case of negligence, but negligence is not proven by proof merely of damage. There is perhaps another feature of the case which calls for comment which, at the cost of adding to the length of an overlong opinion, we will make. Proctors for libelant have indulged themselves in an excusable criticism of the tug masters who testified

for respondents. It was natural and hence probable that they should have taken sides against the libelant. The antagonisms which grow out of class feeling are strong among men who follow the water. We are concerned, however, not with their motives, but the truth of their testimony. Whether the experienced proctors for libelant took this view of it or not, the case for libelant developed a theory of recovery based on the fact that it was usual, customary, and proper to dock vessels at the high-water slack by going up stream and coming down to the end of the pier and the warping the vessel around so as to berth her alongside the pier on the south side. The Kellogg was not docked in this way, but the attempt was made to bring her to the pier with her head up stream. The ergo was that the docking was improperly done. It is clear enough that these witnesses had the wrong thought of the operation. The custom of high-water docking was adopted, not for the benefit or safety of the vessel but of the pier, although there was likewise a saving of time and coal to the tugs. The reasons for this are obvious. The circumstance of whether the vessel comes to the end of the pier with head down stream or up stream, just as obviously is answered by the tide. The whole effect of the testimony of the tug masters was to establish the truth (which was also obvious) that the tanker was under the tidal conditions properly maneuvered. It was the witnesses for the libelant who had the wrong idea, not the tug masters. The docking at low water was primarily for the benefit of the consignees, although it also saved the time of the tugs. This did not excuse the respondents for bringing the tanker in if it was not safe to attempt it before high water. The question hence becomes one of the exercise of the good judgment of a well-informed mind. Our final finding in effect is that every proper precaution to inform themselves of conditions was taken by respondents, and that, under the conditions known, and which should have been known to them, it was good judgment to attempt to do what was done and there was no negligence in it.

We think that, under the fact findings made, the conclusion reached is a line with the cases cited to us among which are The Somers N. Smith (D. C.) 120 F. 569; The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Ft. George, 183 F. 731, 106 C. C. A. 169; The Blakeslee, 243 F. 365, 156 C. C. A. 145; The Mercury (D. C.) 291 F. 797; The Baldwin (C. C. A.) 271 F. 411; The Louisa (D.

C.) 209 F. 1001; Great Lakes v. Hand (D. C.) 289 F. 130.

The conclusion reached is that the libel should be dismissed, with costs.