## THE VIM.
### No. 1614.

District Court, D. Rhode Island.
May 21, 1930.

Charles W. Hagen and Charles A. Van Hagen, Jr. (of Bigham, Englar, Jones & Houston), both of New York City, and Archibald C. Matteson, of Providence, R. I., for libelant.

Harold A. Andrews (of Hinckley, Allen, Tillinghast, Phillips & Wheeler), of Providence, R. I., for respondent.

LETTS, District Judge.

This is a libel based upon the alleged negligent towing of the barge Mauch Chunk by the tug Vim.

The barge Mauch Chunk, carrying a cargo of 822 tons of coal and belonging to the libelant, arrived at Newport in tow of a tug owned by the Engel-Megee Towing & Transportation Company on April 22, 1926. The cargo was consigned to George T. Fearney & Co. at Narragansett Pier, R. I. The barge lay at Newport for two days, during which time negotiations were in progress between Mr. Megee, representing the Engel-Megee Company, and Mr. Hayes, the owner of a local tug, the Vim, to arrange for the transfer of the barge from Newport to Tucker's wharf at Narragansett Pier.

It appears that the wharf at Narragansett Pier has been little used for discharging cargoes from barges. It is located at a somewhat exposed point where an ocean swell is always in evidence, and very little has been done to provide an adequate breadth and depth of channel to gain access to the wharf. Neither Mr. Hayes nor Mr. Burns, his foreman in charge of operations, appear to have had any definite knowledge in regard to either the depth or the location of the best approach to the wharf. It is clear that both regarded the accommodations there provided as inadequate for handling a loaded barge such as the Mauch Chunk. They had no adequate chart of the conditions at Tucker's wharf or the channel leading to it, and made no effort to procure one before undertaking the towage. Burns did, however, communicate with Mr. Fearney, the consignee of the cargo, who, in turn, made some inquiry of a Capt. Clark about the channel. Mr. Fearney testified that he reported to Burns that the barge should be brought in at full tide, so that he could lighten part of the cargo before low tide reduced the depth of the water in the slip. Mr. Fearney also reported to Burns that the proper mode of approach was to enter in a direct line from Beaver Tail light to the end of the wharf, and that the depth of the water in the channel approaching the wharf at low tide was about 14 feet. It appears that the average difference at this point between high and low tide is about 3.4 feet. Burns testified in part as follows: "We looked it up on the chart that day and there was 14 feet, the chart gave, but that was quite a distance out from the wharf, so I told Mr. Fearney and he told me he would take it up with some Captain Clark, an old steamboat man that knew just how the channel was dredged in there and he called me Friday and he told me, he said the channel is to carry Beaver Tail over your stern and you will find 17 or 18 feet of water into the dock and 14 feet at the outer berth, and I think it was 10 in the inner."

Hayes testified that at the time he finally agreed to take the barge with his tug from Newport to Narragansett Pier he advised Mr. Megee, of the other towing company, that the place was not right to put the barge in or to leave it, and that he would not undertake it unless he (Megee) would assume the responsibility. It is also claimed that upon these conditions Megee told either Hayes or Burns to go ahead. Nowhere in the testimony is there any claim that this alleged understanding as to the responsibility was made known to the libelant as owners of the barge and cargo.

On the morning of April 24 the tug Vim, with Capt. Hynes in charge, proceeded with the barge to its destination, arriving off Tucker's wharf at about 10 a. m., at which time the tide was flowing out and near low. It appears that Capt. Hynes proceeded to a point variously estimated from 150 to 350 feet off Tucker's wharf with the barge in tow. The tug then ceased towing and came alongside to starboard of the barge, made fast, and proceeded to breast her into the slip. The barge, as loaded, drew about 11½ feet forward and 12 feet aft, leaving, at most, only 2 feet of water in the most favorable part of the area approaching the wharf, which was referred to as the channel, without making any allowance for the effect of the ocean swell. It would appear from the testimony that 2 feet is an inadequate allowance for the effect of that condition.

The testimony clearly shows that on the morning in question the weather conditions were satisfactory, although a good sea swell was present. The captain of the tug was aware of the tidal conditions and must have known that there was little, if any, excess water to float the barge into the wharf. There were no circumstances present, either in the weather conditions or the terms of the undertaking, which constituted an obstacle to his proceeding with all diligence. Mr. Fearney had urged that the barge be put in place early in the morning at high tide; Captain Hynes apparently elected to undertake it at low tide. He made no effort to make soundings of the channel, with which he was unfamiliar, before proceeding to breast the barge into place. A short distance from the wharf, and somewhat northerly from the line which had been given from Beaver Tail light to the wharf, the Mauch Chunk was stranded upon the rocks and immediately filled.

Do these facts constitute negligence on the part of those in charge of the tug? I am compelled to answer this question in the affirmative.

The case is closely analogous to the facts presented in the case of McMillan v. Moran (D. C.) 107 F. 149. In that case a British bark was being towed under the Brooklyn Bridge. Those in charge of the towage had been urged to proceed at low tide, but, relying upon the assurance of the master of the bark that the masts were but 133 feet high and their understanding that the bridge was 135 feet above mean high water, they elected to proceed at high tide. It developed that the masts were slightly more than 133 feet, and that no allowance had been made for the effect of the load upon the bridge and the lengthening of its steel cables by the action of the heat. As a consequence of these factors, the clearance space under the bridge at the time was less than 135 feet, and, in passing underneath, the masts of the bark were damaged. The court found that the tug captains were negligent.

In the present case the respondent as well as his representative, Capt. Hynes, were familiar with the general inadequacy of accommodations at the wharf where the barge was to be placed. They knew that the berth was little used commercially. They knew that such information as they had obtained was largely from Mr. Fearney, who was not a seaman, and that it did not justify a blind acceptance. All the facts considered, Capt. Hynes was put on notice to proceed with deliberation and caution. It was his duty, under the circumstances, to arrive earlier and put the barge in place before low tide, to have awaited the next incoming tide, or to have proceeded at the time with such caution as to have avoided mishap in event his information as to conditions was either inaccurate or provided too small a margin of safety in face of the effect of the action of the ocean swells upon the channel depth. None of these things did he do. It is clear that he was not only proceeding somewhat off the line of approach which had been given him, but he assumed that there was sufficient water, when he should have more carefully investigated the conditions before undertaking to breast the barge into place at low tide.

In the case of Thompson v. Winslow (D. C.) 128 F. 73, 82, Hale, J., quoted with approval the following from the opinion in the case of The Henry Chapel (D. C.) 10 F. 777: "The rule of law is perfectly well settled that a tug undertaking to tow a vessel in navigable waters is bound to know the

proper and accustomed waterways and channels, the depth of water, and the nature and formation of the bottom, whether in its natural state or as changed by permanent excavations." See, also, Consolidated Coal Co. v. Knickerbocker Steam Towage Co. (D. C.) 200 F. 840; The Somers N. Smith (D. C.) 120 F. 569, 576, and White v. Upper Hudson Stone Co. (C. C. A.) 248 F. 893.

In the case of The Margaret, 94 U. S. 494, 497, 24 L. Ed. 146, the court, in referring to the duty of the tug, said: "She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in every thing relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences."

The only remaining question is that presented by the contention that the terms of the undertaking exonerated the owner of the tug from responsibility for any accident resulting from putting the barge in place, respondent Hayes having advised Megee that it was not a right place to put a boat and having said that he would not undertake it on his own responsibility. Such an understanding as that claimed by Hayes cannot exonerate him from the responsibility of a mishap resulting, not primarily from the conditions over which he had no control, but from the faulty carrying out of the undertaking assumed. There is no contention that the barge could not have been put in place at Tucker's wharf at full, or near full, tide if the line of approach had been from Beaver Tail to the wharf.

In the case of the Somers N. Smith, supra, referring to an oral understanding of exoneration from responsibility somewhat analogous to that here claimed, Hale, J., said: "In the opinion of the court, even if the contract claimed by the owners of the tug had been established, it would not relieve the tug nor her owners from the negligence of the tug or her crew."

In the case of The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, the court said: "It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that, by special agreement, the canal-boat was being towed at her own risk, nevertheless, the steamer is liable, if, through the negligence of those in charge of her, the canal-boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences." See, also, Compania de Navegacion Interior, S. A., v. Fireman's Fund Insurance Co., 277 U. S. 66, 48 S. Ct. 459, 72 L. Ed. 787.

A draft decree in favor of the libelant may be presented for settlement.